THE STATE ex rel. CROW, Attorney-General, v BOONVILLE BRIDGE COMPANY and MISSOURI, KANSAS & TEXAS RAILWAY COMPANY.

In Banc, July 13, 1907.

1. **MANDAMUS: Office of Writ.** The extraordinary writ of mandamus has been properly described as "the right arm of the law." Its principal office is not to inquire and investigate, but to command and execute. But while that is true, it, nevertheless, is designed to meet emergencies and prevent a failure of justice, and should be reserved for extraordinary occasions, and litigants are required to use all available means to obtain the enforcement of their rights before applying to the courts for the assistance of the writ.

2. ——: ——: **Discretion.** Whether mandamus be considered a writ of right or an ordinary action at law, courts have a sound judicial discretion as to whether or not they will issue or refuse the writ, even where a prima-facie right thereto is shown, and though there be no other remedy. The right thereto must be clearly established, and it is never issued in doubtful cases.

3. ——: ——: ——: **Railroad Bridges: To Be Opened to General Road.** Where the evidence fails to show, as it does in this case, that the failure of a bridge company, with a charter right to operate both a railroad and a toll bridge for general road travel, to open the bridge, which has been used as a railroad bridge exclusively for more than a quarter of a century, to the traveling public as a general road bridge, would be such an injury to the general public as would require the court, in the exercise of a sound judicial discretion, to order the bridge to be so constructed that it might be used also as a wagon and road bridge and to be opened and used for that purpose, as well as a railroad bridge, the peremptory writ of mandamus will not go.

4. **CORPORATION: Powers Granted By Charter: Permissive or Obligatory: Good Faith: Mandamus.** Whether or not a bridge company (and its lessee, a railroad company), which had received a charter from the State authorizing it to construct a bridge across the Missouri river for railroad trains and for wagons and general road travel, was under obligation to construct and operate a bridge for both purposes, or whether or not those charter privileges were simply permissive, is a question not decided in this case, because a decision of that question is not necessary to its proper disposition; but the fact that the company in good faith considered as simply permissive the charter right to operate a wagon and general road bridge is considered in determining the right of the Attorney-General to a peremptory writ of mandamus to compel the company to open up the bridge to general road travel.

5. ——: ——: **Acquiescence of State: Laches: Mandamus: Railroad and Wagon Bridge.** Estoppel and laches are not to be applied to the State. But acquiescence for nearly thirty years by the State in the use a bridge company (and its lessee, a railroad company) made of a charter, which granted it the right to construct a railroad and wagon bridge, and which used it during all that time without objection as a railroad bridge exclusively, and reconstructed it at great cost as a railroad bridge after fifteen years or more of said use, will be taken into consideration by the court when it is asked to issue its extraordinary writ of mandamus to compel the company to open the bridge for ordinary road travel.

**6. RAILROAD AND WAGON BRIDGE:** Danger: Mandamus. Where the evidence shows that the bridge across the Missouri river could be used as both a railroad and wagon bridge, only with great danger to the traveling public, and that such use would result in great delay and interruption in the movement of trains and probably the loss of life and property, the court will hesitate to compel the bridge to be reconstructed and prepared for both said uses.

## Mandamus.

PEREMPTORY WRIT DENIED.

*Edward C. Crow*, Attorney-General, and *Sam B. Jeffries*, Assistant Attorney-General, for relator; *J. W. Jamison, W. M. Williams* and *W. Hall Trigg* of counsel.

(1) The State of Missouri had full right and power to authorize the respondent bridge company to erect and maintain its bridge over the Missouri river. 1. The mere grant to Congress of the power to regulate commerce among the States must not be taken, in all cases, to imply a prohibition on the States to exercise the same power. Under their reserved powers, the several States may rightfully legislate on matters of a local nature, as, for instance, the regulation of their internal commerce, inspection, quarantine, and health laws, and laws relating to bridges, ferries and highways. And these laws have full force and operation until circumscribed by direct action of Congress in effectuation of its general power over interstate commerce. Leisy v. Hardin, 135 U. S. 108. (a) State laws regulating pilots: Cooley v. Board of Wardens, 12 How. 299; Steamship Co. v. Joliffe, 2 Wall. 450; Ex parte McNiel, 13 Wall. 236; Wilson v. McNamee, 102 U. S. 572. (b) State laws regulating inspection and the policing of harbors, etc: Gibbons v. Ogden, 9 Wheaton 203; New York v. Milne, 11 Peters 102; Turner v. Maryland, 107 U. S. 38; Steamship Co. v. Louisi-

ana, 118 U. S. 455. (c) State laws providing for improvements of navigable channels: County of Mobile v. Kimball, 102 U. S. 691; Escanaba Transportation Co. v. Chicago, 107 U. S. 678; Huse v. Glover, 119 U. S. 543. (d) State laws regulating wharfs, piers and docks: Cannon v. New Orleans, 20 Wall 577; Packet Co. v. St. Louis, 100 U. S. 423; Packett Co. v. Catlettsburg, 105 U. S. 559; Transportation Co. v. Parkersburg, 107 U. S. 691; Ouachita Packet Co. v. Aiken, 121 U. S. 444. (e) State laws authorizing the construction and maintenance of bridges over navigable streams. 2. The Congress of the United States not having legislated on the subject of the erection and maintenance of bridges over the Missouri river, the State of Missouri had plenary power to authorize the respondent bridge company to erect and maintain its bridge; and the bridge company became, by its charter from the State, invested with the right and franchise so to do without any authorization therefor being first had from Congress. Willamette Iron Bridge Co. v. Hatch, 125 U. S. 1; Rhea v. Railroad, 50 Fed. 16; Gilman v. Philadelphia, 3 Wall 713; Passaic Bridges, 3 Wall, 782; Escanaba Transportation Co. v. Chicago, 107 U. S. 678; Cardwell v. Bridge Co., 113 U. S. 205; Hamilton v. Railroad, 118 U. S. 86. (2) The charter granted by the State of Missouri to the respondent bridge company invested the latter with authority to maintain a toll bridge for the crossing of ordinary road travel. 1. The law under which the respondent bridge company was, on the nineteenth day of December, 1870, organized, expressly provided that, in the articles of association for the formation of a bridge company, should be stated the purposes for which the bridge was to be used, whether for railroads or ordinary road travel, or both. And, in addition to other rights and powers secured to such a company, the statutes conferred the right of eminent domain.

1 Wagner's Statutes 1870, secs. 16 and 17 of article 7, ch. 37. 2. In designating to the State of Missouri the uses to which its bridge was to be dedicated and employed, the bridge company elected to specify that "the said bridge is to be a public toll one for crossing persons and property, and to be used for both railroad and ordinary road travel at reasonable rates." For both of these franchises it made application, and with both of them it became clothed. 3. The signing of articles of association, and the filing of same with the Secretary of State, constitute an acceptance of a charter from the State, and a consequent investiture with the franchises therein named. Railroad v. Shambaugh, 106 Mo. 567; Railroad v. Abell, 17 Mo. App. 645; Queen City F. & C. Co. v. Crawford, 127 Mo. 364; Glymont Improvement & Excursion Company v. Toler, 80 Md. 278; Benbow v. Cook, 115 N. C. 324. (3) The Act of Congress of May 11, 1872, is not repugnant to the charter granted by the State of Missouri to the respondent bridge company, on December 19, 1870. 1. As indicated above, the right of a State to legislate with respect to the erection of bridges over the navigable streams which lie within its borders is a part of its reserved power. Gillman v. Philadelphia, 70 U. S. 726; Leisy v. Hardin, 135 U. S. 108; United States v. Bridge Co., 1 Woodbury & Minot's Rpts. (U. S.) 409; Silliman v. Hudson River Bridge Co., 4 Blatch. 404; Story on the Constitution (5 Ed.), sec. 1070. 2. The Act of Congress does not purport to deal with matters purely internal to the State of Missouri. It leaves to the State— as it justly should—the regulation of travel of a local nature for which the charter granted to the bridge company provides, and confines itself wholly to two matters, both of which concern interstate commerce, viz: (1) The right of all railroads, so desiring, to use the bridge; (2) provision that the bridge structure shall not interfere with navigation. "It is the settled rule

that a statute enacted in execution of a reserved power of the State is not to be regarded as inconsistent with an Act of Congress passed in execution of a clear power under the Constitution, unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or stand together.'' Railroad v. Haber, 169 U. S. 623; Sinnot v. Davenport, 63 U. S. 243; Railroad v. Bridge Co., 8 Fed. 190; United States v. Bridge Co., 1 Woodbury & Minot's Rpts. (U. S.) 418; Transportation Co. v. Parkersburg, 107 U. S. 705. (4) The levy and collection of toll by the respondents is the exercise of a power and franchise referable only to the charter granted by the State of Missouri. 1. The franchise of collecting tolls upon bridges is a part of the sovereign power reserved to the States, and not delegated to the general government. Therefore, the appropriate source of a grant of such a franchise would be the State of Missouri rather than the Federal Government. Gould on Waters, sec. 142; St. Louis v. Turnpike & Ferry Co., 14 Mo. App. 219. 2. Furthermore, the Act of Congress confessed no authority to maintain a toll bridge, and as that right can not be claimed from the act by implication—the sovereign being the grantor—the collection of tolls by the respondents on traffic passing over the bridge on the trains of the railway company is a right conferred only by the charter granted the bridge company by the State of Missouri. This being so, the respondent bridge company can not now, after the exercise for years of the franchise of taking tolls, be heard to say that it does not, nor ever has, derived or claimed any right or privilege from the charter granted by the State. (5) Quasi-public corporations, being invested with public functions, may not, at their own election, refuse to exercise the same. 1. The public interests involved in the franchises conferred on public-service

corporations forbid them, in the absence of express legislative authority, to alienate their property by either sale, lease or mortgage, if, by so doing, they will become disabled, in any degree, from performing the duties they owe to the public. And, for the same reason, their property is not subject to levy under execution. 1 Clark & Marshall on Corporations, secs. 162 and 773; Morawetz on Corporations (2 Ed.), secs. 1120 and 1125; 4 Thompson's Commentaries on Corporations, sec. 5355; St. Louis v. St. Louis Gas Light Co., 70 Mo. 117; Overton Bridge Co. v. Means, 33 Neb. 857. 2. Likewise, the paramount interests of the public have led the courts to subordinate the legal lien of mortgages on the property of the quasi-public corporations to an equity raised in behalf of persons who, by their labor or the furnishing of materials, have enabled the corporation to discharge its duty to the public of a continuous service. Douglass v. Cline, 12 Bush (Ky.) 628; Central Trust Company v. Railroad, 23 Fed. 863; Bound v. Railroad, 47 Fed. 30; Fosdick v. Schall, 99 U. S. 235; Miltenberger v. Railroad, 106 U. S., 286; Union Trust Company v. Souther, 107 U. S. 591; Burnham v. Bowen, 111 U. S. 776; Union Trust Company v. Railroad, 117 U. S. 434; Kneeland v. Brass Foundry, etc., 140 U. S. 592; Railroad v. Carnegie Steel Co., 176 U. S. 257; Reyburn v. Consumers Gas Co., 29 Fed. 561; Ellis v. Vernon Ice, Light and Water Co., 23 S. W. 858. 3. The franchises conferred upon public-service corporations are granted to them in contemplation of the supposed benefit to accrue to the public from a continuous user of the same. Having accepted the franchise, the corporation may not, of its own caprice and choice, disregard its duties to the State by an abandonment of the exercise of the public functions which constituted the consideration upon which the grant was obtained. 7 Am. and Eng. Ency. Law (2 Ed.), 702; Morawetz on Corporations (2 Ed.) sec. 414; 7 Thompson's Commen-

taries on Corporations, sec. 8392. (6) The respondent bridge company having accepted the franchise to operate a toll bridge for ordinary road travel, is compellable by mandamus to exercise the same according to the provisions of its charter. 1. The application to, and obtaining from, the State of the franchise to erect and maintain a toll bridge open to both railway and ordinary road travel; the subsequent building and equipping of the structure for both kinds of travel; and the exercise of the right to take tolls, all conclusively evidence an acceptance by the bridge company of the franchises embodied in its charter. 2. The law applicable to the making of contracts also governs the formation of corporations to the extent of requiring that an acceptance be identical with the terms of the offer. There cannot, in the latter case, be a partial acceptance of franchises, any more than there can be an acceptance by part of the persons intended to be incorporated. Angell & Ames on Corporations (11 Ed.), sec. 85; Morawetz on Corporations (2 Ed.), sec. 22. 3. By the express terms and stipulations of the charter of the bridge company, which provides that the bridge is "to be used for both railroad and ordinary road travel," it became, and is, mandatory upon the company to operate its bridge for the accommodation of ordinary road travel as well as railroad traffic. (See authorities cited in the next clause below.) 4. As the paramount object for which quasi-public corporations exist is the continuous exercise, for the public convenience and welfare, of their governmental functions, an express requirement, either by the terms of their charters or the statutes of the State, is not a condition precedent to the issuance of a writ of mandamus compelling the exercise of a disused franchise. The rules of the common law, of themselves, sanction the writ to enforce those implied duties which spring from the very nature of the corporation, and constitute the ultima

ratio of its existence. Morawetz on Corporations (2 Ed.), secs. 1116, 1117, 1128 and 1129; High on Extraordinary Legal Remedies (3 Ed.), sec. 317; Spelling on Inj. and Extraordinary Remedies (2 Ed.), secs. 1591, 1592, 1594 and 1595; Spelling on Corporations, secs. 896 and 894; Merrrill on Mandamus, secs. 157, 158 and 159; Rorer on Railways, p. 572; State v. Railroad, 29 Conn. 538; State ex rel. v. Traction Co., 62 N. J. L. 592; State ex rel. v. Railroad, 19 Wash. 518; Loan and Trust Co. v. Henning, 4666 Fed. Cases, 17 Am. Law Reg. (N. S.) 266; Potwin Place v. Railroad, 51 Kan. 609; People ex rel. v. Railroad, 176 Ill. 512. And this rule is uniform in its application to all such quasi-public corporations as railroads, gas, and electric light companies, water, ferry and toll bridge companies. In consideration of the franchises they receive, they impliedly agree to exercise the same for the public convenience. State v. Railroad, 17 Neb. 647; People v. Railroad, 130 Ill. 175; People v. Railroad, 120 Ill. 48; State v. Railroad, 80 Minn. 108; Haugen v. Albina L. & W. Co., 21 Oregon 411; Olmstead v. Proprietors of Morris Aqueduct, 47 N. J. L. 331; State v. Consumer's Gas T. Co., 55 L. R. A. 245; Lombard v. Stearns, 4 Cush. 60; State ex rel. v. Water Works, 52 Mo. App. 312; State ex rel. v. Kinloch Telephone Co., 93 Mo. App. 349; Williams v. Mutual Gas Co., 52 Mich. 499; Portland Gas and Oil Co. v. State, 135 Ind. 54; Webster Telephone Case, 17 Neb. 126; Cook on Corporations (5 Ed.), secs. 922 to 940; Beach on Private Corporations, secs. 832 to 836; Taylor on Private Corporations (5 Ed.), secs. 453 and 454. (7) Ample powers are afforded the court whereby its mandate may be enforced. 1. The powers and instrumentalities possessed by the court are fully adequate, in this instance, to secure obedience to its orders. The courts have not hesitated to award writs of mandamus in cases where the superintendence required of the court has been of larger magnitude than the necessities

State ex rel. v. Bridge Co.

of the case at bar would call for. The writ has issued to compel performance of the following acts, viz.: (a) To repair an abandoned portion of a railroad, and run trains over same. Farmers' Loan & Trust Co. v. Henning, Fed. Cases No. 4666. (b) To run trains over an abandoned portion of a road. State v. Railroad, 29 Conn. 538. (c) To relay tracks over an abandoned route. Rex v. Railroad, 2 Barn. & Ald. 644. (d) To build bridges. State v. Canal Company, 26 Ga. 665; People v. Railroad, 70 N. Y. 569. (e) To repair and maintain bridges. People v. Railroad, 37 How. Pr. 427; State v. Railroad, 80 Minn. 108. (f) To build and maintain railroad stations. R. R. Com. v. Railroad, 63 Me. 269; People v. Railroad, 40 Hun 570; Fort Dodge v. Railroad, 87 Iowa 389. (g) To operate its road. State v. Traction Co., 62 N. J. L. 592; State v. Railroad, 19 Wash. 518; City of Potwin Place v. Railroad, 51 Kan. 609; People v. Railroad, 176 Ill. 512; People v. Railroad, 28 Hun 543; Loader v. Railroad, 35 N. Y. Supp. 996. (h) To run trains daily. In re Railroad, 1 Pug. & B. (N. B.) 667. (i) To run trains to terminal. People v. Railroad, 120 Ill. 48. (j) To erect stations and stop trains at same. State v. Railroad, 17 Neb. 647; People v. Railroad, 130 Ill. 175. (k) To so construct railroad as not to prevent public from using highway. State ex rel. v. Railroad, 86 Mo. 13. 2. In order that the mandate of the court may be made effectual, the appointment of a receiver is provided for by our statutes, whose duty shall be to take possession and management of all the property, rights, privileges, franchises and business of the disobedient corporation, to the end that he may proceed to carry out the acts required to be done by the peremptory writ. R. S. 1899, sec. 993. (8) The respondent railway company, as lessee of the bridge and of the franchises of the bridge company, may be compelled by mandamus to dis-

charge the public duties it has thereby assumed. It being the policy of the law to safeguard the public interests by demanding of public service corporations the faithful performance of their charter functions, it is now well established that the lessee of the franchises of such a corporation thereby becomes bound to discharge and perform all the public duties which rested upon its lessor. People ex rel. v. Railroad, 176 Ill. 512; Mayor v. Railroad, 113 N. Y. 311; Chicago v. Evans, 24 Ill. 52; Mullen v. Phila. Traction Co., 19 Phila. 441; McGregor v. Railroad, 35 N. J. L. 89; Railroad v. Sly, 69 Pa. St. 205; Daniels v. Railroad, 62 Mo. 43; McCall v. Chamberlain, 13 Wis. 637; Booth on Street Railways, sec. 426; Elliott on Railways, secs. 458 and 461. (9) The exclusive franchise to maintain a ferry does not militate against the right of the State to thereafter grant to another authority to operate a bridge at the same point. 1. It is the settled rule of construction, in grants where the sovereign occupies the position of grantor, that nothing is to pass by implication. Charles River Bridge v. Warren Bridge, 11 Peters 544; Cooley's Constitutional Limitations (7 Ed.), pp. 565, 566 and 567; Lackland v. Railroad, 31 Mo. 185. 2. The exclusive privilege which the State of Missouri, in 1861, granted to John Porter to maintain a ferry at the point in question, did not have the effect of precluding the State from thereafter rightfully conferring on the respondent bridge company a franchise to erect and maintain a bridge for the crossing of ordinary road travel. The grant of an exclusive ferry franchise is not, by implication, to be construed into an exclusive right as against all other modes of transportation and convenience. Piatt v. Bridge Co., 8 Bush (Ky.) 31; Parrott v. City of Lawrence, 2 Dillon 332; Lake v. Railroad, 7 Nev. 294; Piscataqua Bridge v. N. H. Bridge, 7 N. H. 60; Mayor v. Transfer Co., 14 Blatch. 159; Mohawk Bridge Co. v. Railroad, 6 Paige's Ch.

565. (10) Mere inaction and silence by the State, however long continued, do not create an estoppel. The defense interposed by respondents wherein it is claimed that the inaction of the State, in permitting the bridge to be devoted exclusively to railroad travel, has ripened into an estoppel, is destitute of merit. The sovereign power of a State, whose untrammelled exercise is essential to the welfare of its citizens, may not, by mere silence and inaction, be lost nor restricted. Presumption of a waiver cannot be indulged in as against the State. State ex rel. v. Railroad, 140 Mo. 558; State ex rel. v. Lincoln Trust Co., 144 Mo. 562; 28 Am. and Eng. Ency. Law (1 Ed.), 568-569.

*George P. B. Jackson* for respondents.

(1) The right to a remedy by mandamus is never absolute. The court will always exercise a sound discretion in awarding or refusing the writ. 2 Spelling, Extraordinary Relief, secs. 1371 to 1379; 19 Am. and Eng. Ency. Law (2 Ed.), 751; Merrill on Mandamus, sec. 62; State ex rel. v. Railroad, 77 Mo. 147; State ex rel. v. Associated Press, 159 Mo. 410. Where the party seeking the remedy has been guilty of laches, it will be denied. 2 Spelling's Extraordinary Relief, sec. 1382; 19 Am. and Eng. Ency. Law (2 Ed.), 755; People ex rel. v. Chapin, 104 N. Y. 102. "Cases may arise where the applicant for relief has an undoubted legal right for which mandamus is the proper remedy, but where the court may, in the exercise of a wise judicial discretion, still refuse the relief." High on Extraordinary Remedies, sec. 9; State ex rel. v. Railroad, 77 Mo. 147; 2 Morawetz on Priv. Corps. (2 Ed.), sec. 1134. (2) The Boonville Railroad Bridge Company was incorporated under the article on "Manufacturing and Business Companies." The purposes specified in its "articles of association" were permissive and not obligatory. A business corporation may engage in any one

or more of the branches of business authorized by its charter, or it may engage in none of them. It may discontinue any or all branches at will. R. S. 1899, sec. 1351—and art. 9, chap. 12, generally; also secs. 977 and 1018; 1 Morawetz on Priv. Corps., secs. 365-366-419; State ex rel. v. Associated Press, 159 Mo. 423; 2 Morawetz on Priv. Corps., sec. 922; Railroad v. Comr's, 112 U. S. 609; Railroad v. Delamore, 114 U. S. 501. A law was enacted by Congress, and approved May 11, 1872, authorizing the construction of the bridge, but the franchise was limited to railroad purposes. 17 U. S. Stats. at Large, 99; Cardwell v. Bridge Co., 113 U. S. 205; Miller v. Mayor, 109 U. S. 385; Bridge Co. v. Hatch, 125 U. S. 1. Consequently the bridge company never had and has not now any lawful authority or valid franchise to operate the bridge for general road purposes—and to grant the relief sought in this case would be to command the doing of something that cannot be lawfully done. (3) The writ must be denied as against the railroad company for further reasons: 1. Because mandamus will not lie to enforce a contractual duty. State ex rel. v. Associated Press, 159 Mo. 422; State ex rel. v. County Court, 39 Mo. 375; 2 Spelling, Extraordinary Relief, secs. 1379 and 1438; 19 Am. and Eng. Ency. Law, 742. The only ground set forth in the writ for the relief asked against the railroad company is that by the lease from the bridge company to the railroad company the latter undertook and "covenanted to maintain and operate the said bridge as a public toll one for the crossing of both railroad and ordinary road travel." If that were the proper construction of the lease, it would not entitle the relator to relief by mandamus. 2. The leases show that the railroad company did not covenant to operate the bridge for ordinary road purposes. 3. The railroad company was organized under the laws of the State of Kansas, and is a corporation and citizen of that State, having only

such powers as were conferred by the laws of Kansas. As such it was not authorized to engage in the business of operating a toll bridge for general road purposes in the State of Missouri, or elsewhere. 1 Gen. Statutes of Kansas, 1897, chap. 70. To meet this objection relator contends that the M., K. & T. Ry. Co. has consolidated with the Missouri, Kansas and Eastern Railway Company, a Missouri corporation, and thereby the former has also become a corporation of Missouri, and as such has power to operate a toll bridge for ordinary road purposes. But such is not the effect of the transactions between the two railroad companies named. The respondent railroad company still remains a Kansas company with the powers it derived from that State. Railroad v. James, 161 U. S. 545; Railroad v. Steele, 167 U. S. 659; Railroad v. Louisville Trust Co., 174 U. S. 552; Taylor v. Railroad, 89 Fed. 119; Walters v. Railroad, 104 Fed. 379; Winn v. Railroad, 118 Fed. 64; R. S. 1899, secs. 1060, 1059; 1 Gen. Statutes of Kansas, 1897, chap. 70, secs. 92, 93, 94, 95 and 51; Barron v. Burnside, 121 U. S. 186; Railroad v. Denton, 146 U. S. 207; Steamship Co. v. Kane, 170 U. S. 111; Blake v. McCling, 172 U. S. 255; 2 Morawetz on Priv. Corps. secs. 939, 940 (and cases in note 2) and 942; McCabe's Admx. v. Railroad, 66 S. W. 1054; Williams v. Railroad, 3 Dillon 267. (4) Neither of the respondents ever used the bridge for general road travel. The construction and equipment of the bridge for such travel was never completed. The bridge was never opened for such purpose. The public was never invited to use it, but on the contrary was always excluded from such use. No toll was ever collected or demanded for ordinary road travel. The privilege of engaging in such business was never availed of, and the franchise was never used. The law did not impose the duty of conducting a bridge for ordinary road travel. Under such circumstances the court will not, through its writ of

mandamus, undertake to compel either of the respond-
ents to now engage in such business. 2 Morawetz on
Priv. Corps., secs. 1126 to 1129, and 1025; 2 Spelling,
Extraordinary Relief, sec. 1595; 19 Am. and Ency.
Law, 872; Railroad v. Reg., 22 Law J. Q. B. 225; Rail-
road v. State ex rel. (Tex.), 39 S. W. 926; Railroad v.
Washington Ty., 142 U. S. 49; Com. v. Rail-
road, 12 Gray 180; State v. Railroad, 18 Minn. 40.
The bridge company is a private corporation (as is
also the railroad company). Dartmouth College v.
Woodward, 4 Wheat. 668. As such the bridge com-
pany is subject to the same rules that apply to other
private business corporations organized under the
same statute. It is authorized to engage in a quasi-
public business if it elects to do so. If it undertakes
such business it is subject to regulation therein by the
State, but until it does engage in that kind of business,
it is as free as any other business corporation to deter-
mine whether or not it will avail itself of the permis-
sive right to do so. In the case of railroad companies
it has been held that, for various reasons, they will not
be required to resume the operation of a discontinued
line, nor to operate an unprofitable road, nor to recon-
struct a dismantled or defective track. Railroad v.
State ex rel. (Tex.), 39 S. W. 926; People v. Railroad,
24 N. Y. 261; People v. Railroad, 42 Fed. 638; State ex
rel. v. Railroad, 36 Pac. 755; Railroad v. People ex rel.
(Ill.), 11 N. E. 347. (5) The State has acquiesced in
the construction which respondents have put upon their
charter duties, and has allowed thirty years to elapse
without any effort to assert the right now insisted up-
on. State officials have dealt with the property under
laws relating to railroad bridges alone. The courts
have treated it as exclusively a railroad bridge. The
public stood by and saw the floor removed in 1880, and
the balance of the superstructure removed in 1894-5
and 6, and a new and expensive bridge designed for ex-

clusive railroad purposes, substituted in its place, and made no objection. Without complaint or protest they permitted the expenditure of a very large sum of money in the reconstruction of the bridge, allowed the railroad company to become bound by its guaranty of the bonds of the bridge company, and suffered many persons to invest their money in the purchase of those bonds. This is not strictly estoppel but it is a controlling reason to influence the court in the exercise of its discretion against the relief sought by this proceeding. Atty.-Gen. v. Railroad, 27 N. J. Eq. 24; People ex rel. v. Chapin, 104 N. Y. 102; Silver v. Railroad, 101 Mo. 85.

(6) The court will not grant relief by mandamus in this case for various other reasons: 1. The bridge company does not own any property on the south, or Boonville, side of the river. The railroad right of way extends to the water's edge, and from that point it would be necessary to appropriate the railroad property for the use of ordinary road travel to get to and from the terminus of the bridge property. The railroad right of way cannot be condemned for even such other public use. R. S. 1899, sec. 1272. 2. There is no public road on the north, or Howard county, side accessible to an approach to the bridge. The supposed approach (even if it were such) does not reach any public road; it terminates on the land of the Porter heirs. In order to meet this objection relator contends that there are two public roads over which an outlet from the bridge can be found. But in that he is mistaken, the so-called approach does not touch either of the supposed roads. It is claimed that these roads have been acquired by user and adverse possession. The road along the river side of the island extending from Michel's store, under the bridge, to the cabins on the upper end of the island, was used entirely by permission of Porter,—as a means of getting to the different ferry landings, and for the convenience of his own ten-

ants. There was no element of adverse use. Pitzman v. Boyce, 111 Mo. 392; Jones on Easements, sec. 282; Hurt v. Adams, 86 Mo. App. 73. The road leading towards Kingsbury, at the foot of the dike, was on the right of way of the bridge company; and a road by user and prescription could not be acquired there. R. S. 1899, sec. 4270. This has been the law since 1865. Hargis v. Railroad, 100 Mo. 223; Railroad v. Totman, 149 Mo. 657; Thompson v. Railroad, 110 Mo. 160; Williams v. St. Louis, 120 Mo. 403; Brown v. Carthage, 128 Mo. 10; Railroad v. Smith, 170 Mo. 327. 3. The court will not award mandamus, because the respondent is not able to comply with the order of the court; and because the enforcement of the writ would impose on the court the necessity of supervising the conduct of the business of the respondent; and because there is no certain public necessity for the opening of the bridge, and it would impose unreasonable burdens on the respondents, and entail great expense and loss, with no certainty of returns, and would probably occasion litigation with third parties, and injure the property of third persons unnecessarily; because it would not benefit the public generally, but, at best, only a small portion, and would be to the disadvantage of many others. 2 Morawetz on Priv. Corps., secs. 1134, 1135 and 1136; 2 Spelling on Extraordinary Relief, secs. 1372 and 1377; State ex rel. v. Associated Press, 159 Mo. 423; State ex rel. v. Railroad, 77 Mo. 147. Because the use of the bridge for ordinary road travel jointly with railroad use, would be dangerous, and would unreasonably interfere with the operation of the railroad, and would hinder and delay the transportation of mails, passengers and freight. And because the relief must be limited to the scope of the alternative writ, while from the whole record it appears the allegations of the petition and writ were not founded in fact, and that to restore the bridge to its former condition would not fit it for ordinary

road travel. State ex rel. v. Railroad, 77 Mo. 148; High on Extraordinary Remedies, sec. 548; Tapping on Mand., 327; Moses on Mand., 207; State ex rel. v. Pacific, 61 Mo. 159; State ex rel. v. Holladay, 65 Mo. 77; School Dist. v. Lauderbaugh, 80 Mo. 194; State ex rel. v. Associated Press, 159 Mo. 422.

FOX, J.—This is a proceeding by mandamus to compel the opening of the Boonville railroad bridge for general road travel. The alternative writ recited that the Boonville Railroad Bridge Company was incorporated under the laws of the State of Missouri, in December, 1870, for the purpose of constructing and operating a public toll bridge across the Missouri river at Boonville, Missouri, and was to be used for both railroad and ordinary road travel, and that by virtue of its incorporation, it was vested with power and authority to exercise the right of eminent domain necessary to acquire proper terminals and approaches, and to construct and operate a bridge for the purposes aforesaid for a period of one hundred years; that immediately after its incorporation it did, during the years 1870, 1871 and 1872, by virtue of said authority, erect a large steel and iron bridge over the Missouri river at Boonville, and also constructed proper and sufficient approaches and driveways, leading to and from said bridge at either end; that said bridge was floored with thick oak lumber for the accommodation of ordinary road travel, and that in or near the middle of said bridge were laid iron and steel rails for the crossing of railroad trains; and that said bridge was so constructed and was of sufficient strength and width to be well adapted to the crossing over of both railroad trains, vehicles, foot passengers, and other ordinary road travel, and the said bridge was during said years used by the public generally, who desired to cross the same on foot, or horseback, in wagons, and in other vehicles.

The writ further charged that about May, 1873, the bridge company leased to the railway company, a corporation organized under the laws of Kansas, the bridge and all the property connected therewith for the full term of the corporate existence of the bridge company, and that by the terms of said lease, the bridge company agreed to maintain its corporate existence and organization during said term, and the railway company covenanted to pay all the expenses incident thereto, and also to maintain and operate the bridge as a public toll bridge for the crossing of both railroad and ordinary road travel, so as to satisfy the demands of the public, and to do and perform all requirements then existing or that might thereafter be imposed on the bridge company by the laws of Missouri; that the bridge company is still a body corporate with powers aforesaid, and that the railway company still is a corporation, operating a railroad through the counties of Cooper and Howard in the State of Missouri; "that said bridge constitutes a direct and important means of public travel, and one necessary to the convenience of a great number of citizens of the State of Missouri; that the nearest crossing over the Missouri river below said bridge is at Jefferson City, forty miles distant, and the nearest above said bridge is at the city of Glasgow, twenty miles distant; that there are many thousands of persons in the country and cities tributary to the said railroad bridge, and especially in the populous cities of Boonville, Bunceton, and Pilot Grove in Cooper county, and in the cities of Fayette, New Franklin and Rocheport in Howard county, who desire to travel over and use said bridge for ordinary road travel, and to drive and move their cattle, horses, hogs and other property, and the farm products, over and across said bridge at reasonable rates of toll, and who would so use said bridge were they not wrongfully and unlawfully excluded therefrom."

The said writ also charges that while it was the duty of the bridge company, by virtue of the law of the State of Missouri, and of the railway company by virtue of the lease aforesaid, to so use and operate and maintain said bridge, yet both of said companies "wholly disregarded their duties in the premises, and in violation of the laws of the State of Missouri and in utter disregard of the rights of said State and its citizens and the public who desire to use and have the right to use said bridge for ordinary road travel, about 1880 wrongfully and unlawfully took up and removed the flooring of said bridge, blockaded its approaches, and closed said bridge to public travel, and have ever since wrongfully and unlawfully turned away from said bridge many thousands of persons who desired to cross the said bridge on foot, on horseback, in wagons and in other vehicles, and who have applied daily to cross said bridge, offering and tendering a reasonable toll therefor, and that since said time the railway company, with the consent and at the direction of the bridge company, has wrongfully and unlawfully excluded ordinary road travel from said bridge, and ever since has used and now uses said bridge for its own purposes exclusively for the crossing of its trains," etc.

The command of the writ to the respondent is that "You do forthwith reconstruct proper approaches and roadways at either end of said Boonville Railroad Bridge; that you refloor the same, and that you proceed to so equip and furnish said bridge as to provide for the reasonable accommodation of ordinary road travel as well as for railroad trains, and that said bridge be thrown open to the public for ordinary travel, and at reasonable rates of toll," and that they show cause why they have not done so.

The respondents filed separate returns, which were the same in effect, the necessary changes being made to adapt the return to the different conditions relating to

the respective respondents.    The substance of the returns is as follows:

It was admitted that the bridge company was organized as a business corporation under the laws of Missouri, December 19, 1870, and that by its articles of association it was to have the right to operate a public toll bridge for the crossing of persons and property by ordinary road travel if they should desire to do so, and should obtain proper authority therefor.    It was denied that any authority was derived from the State of Missouri to construct and operate a bridge for any purpose whatever across the Missouri river.    It was admitted that about the years 1871, 1872 and 1873, the bridge company did procure a bridge to be constructed across the river at Boonville, and caused a track to be laid thereon for the passage of railroad trains, but denied that it ever constructed any approaches or driveways at either end of the bridge, or that the bridge was fitted for ordinary road travel, or that the bridge was ever used at any time by the public for general road travel, either on foot, on horseback, in wagons or other vehicles.

It is also alleged that the Missouri river is a navigable stream, over which the Congress of the United States has assumed jurisdiction and control, and alone has the right and authority to regulate and control the use of the same, and especially to control and regulate the erection of bridges across said river, and that the State of Missouri has no authority, and could not and did not attempt to confer any right or authority to construct the bridge across the river at Boonville; that the bridge was constructed under the authority of an act of Congress, approved May 11, 1872, entitled ''An act to authorize the construction of a bridge across the Missouri river at Boonville, Missouri,'' and that the right, privilege and franchise for the construction of said bridge depends entirely upon

the construction of the said law of the United States, which was the only right, authority or franchise ever granted for said bridge, and that by the same the use of the bridge was restricted and confined to the purpose of laying railway tracks over said bridge for the more perfect connection of railroads that might be constructed to the Missouri river at said point; and that no authority or franchise was ever granted to operate or use said bridge for general road travel.

It was admitted that about May 1, 1873, the bridge company leased the bridge, together with the property connected therewith, to the respondent railway company; that the bridge company has ever since maintained its separate corporate existence, and it is denied that the railway company covenanted to operate the bridge as a public toll bridge for ordinary road travel.

It was further admitted that since the date of the lease, the railway company, a corporation organized under the laws of Kansas, has been engaged in operating a line of railroad extending through the State of Missouri and through the counties of Cooper and Howard. It is further averred that the railway company's roads extend from Hannibal and St. Louis, uniting at Franklin Junction, and thence from Boonville and Kansas City, uniting at Parsons, Kansas, and thence through the State of Kansas and the Indian Territory to near Denison, Texas, where it connects with another system of roads extending to the Gulf of Mexico, and reaching all important points in the State of Texas; that the respondent railway company is engaged in the transportation of persons and property and mail and express matter over its railroads, and the opening of the bridge to public road travel would greatly interfere with said business, and delay the movement of trains and impair the efficiency of the service of the railway.

It is denied that the bridge constitutes a direct means of public travel, or one necessary to the convenience of any great number of citizens of the State, but on the contrary, it is alleged that no considerable portion of the people of the State desire to have the bridge opened or to use the same; that there is no general demand for opening the bridge to general travel; that the demand for the same exists only on the part of certain merchants of Boonville, at whose instigation this proceeding was instituted, in order to enable them to divert trade from the town of New Franklin, which has become a successful rival of Boonville.

It is also averred that it is not feasible to adapt said bridge to the combined use of railroad and ordinary road travel. The approach to the bridge on the north side is on a high fill, extending across low lands for a great distance, and which lands are subject to annual overflow, and that by reason of the character of the soil, the embankment upon which the tracks approaching said bridge is laid is liable to be washed away by the Missouri river, and to protect the same, it has been and is necessary, at great expense, to construct stone dikes at various points and in various directions, and to make excavations along the sides of the embankment, and that to locate and maintain a public wagon road in the neighborhood thereof would greatly interfere with maintaining the railroad track and embankment in a secure and safe condition. It is further averred that there is no public road opened or established in Howard county with which the bridge could be connected within a reasonable distance, and that neither the bridge company nor the railway company has any power or right to proceed to the opening or location of public roads.

It is further averred that the approach to the bridge in the city of Boonville on the south side of the river is through a deep cut; that the bridge company

does not own any land whatever on the south side of the river or in the city of Boonville; that the south end of the bridge terminates on the right of way of the railway company at the edge of the Missouri river, and is elevated many feet above the stream; that the railroad track passes from the bridge through the cut in a high bluff, passing many feet above the track of the Missouri Pacific Railway company which extends along the south bank of the Missouri river; that there is no public street for some distance south of the south end of the bridge, and that neither the bridge company nor the railway company owns any land upon which to construct an approach for wagon travel; that no outlet could be found for travel from the bridge unless the same passed for a great distance over the tracks of the railroad.

It is denied that there is no other means of crossing the river between Jefferson City, forty miles below Boonville, and Glasgow, twenty miles above, but on the contrary, it is averred that for many years prior to 1870, there had been, and ever since has been, and still is a steam ferry operated across the Missouri river at Boonville; that said ferry is operated by virtue of a special franchise granted by the State of Missouri, which confers upon the owners of said franchise the exclusive privilege of crossing people on foot, on horseback, in wagons, or in other vehicles, and stock of all kinds; and it is further averred that when the bridge company was incorporated, it was notified by the owner of the ferry that if it attempted to use the bridge for general road travel legal proceedings would be instituted to prevent the same, and no effort was ever made by the bridge company or by the railway company to operate the bridge for such purposes, and thereby conflict with the rights of the ferry. And it is further specifically denied that the bridge was ever constructed or fitted for such general road travel, or that ap-

206 Sup—7

proaches were ever constructed at either end for such travel, or that the bridge was ever used for general road travel, or that any toll was ever exacted, collected or received, either by the bridge company or the railway company, except for persons and property carried over the bridge in trains.

It was denied that there are many thousands of persons, or any other number outside of the merchants of Boonville as aforesaid, who desire to travel over or use said bridge for ordinary road travel, or to drive and move their cattle, horses, hogs and other property across the same, or would use said bridge if not excluded therefrom; and it is specifically denied that anyone is wrongfully or unlawfully excluded from the use of the bridge, or that it is the duty of the bridge company or the railway company to use, maintain or operate said bridge as a toll bridge for ordinary road travel; and it denies that the railway company ever covenanted or agreed to use or operate the same, or that either the bridge company or the railway company has disregarded any duty or violated any law, or that any portion of the public had any right to use the bridge for ordinary road travel, or that about the year 1880, or any other time, either or both of said companies wrongfully removed the flooring or blockaded the approaches of said bridge, or closed the same to public travel, or wrongfully or unlawfully turned away many thousands or any other number of persons who desired to cross the bridge on foot, on horseback, in wagons or in other vehicles; and denies that at any time any number of persons have applied to cross said bridge, or paid or tendered any toll whatever therefor.

It is admitted that since the year 1880, the railway company has used the bridge, as it always did from the date of its lease in 1873, for the exclusive purpose of crossing its trains, cars and engines, which use it is averred is the only lawful use to which the bridge could

be put.

It is also averred that in addition to the interference with the business of the railway company, the use of said bridge for ordinary road travel would greatly endanger the lives of the persons and the safety of the property attempting to pass over the same, and would thus inaugurate a use of the bridge which experience at other places has taught is highly dangerous, and which has been abandoned wherever it was possible to do so.

It is further averred that ever since the completion of the bridge, the State of Missouri and the people thereof have acquiesced in the use of the same as an exclusive railroad bridge, and that never, prior to the institution of this proceeding, has the State claimed or demanded that the bridge should be used for general road travel, but on the contrary, the State has regularly, from year to year, assessed the bridge and levied and collected taxes thereon, by virtue of the law governing and applicable to railroads and railroad bridges, and has otherwise generally dealt with said bridge and the bridge company and the railway company in respect to said bridge, on the theory that under the conditions it was exclusively a railroad bridge, and not a bridge for ordinary road travel; that, relying upon the construction so placed upon the duties and powers of the bridge company and the railway company as its lessee, as being the correct and true interpretation of the powers, franchises and duties of said companies, by the State of Missouri and its duly constituted authorities, the railway company, at a great outlay of money, under an arrangement with the bridge company, entirely reconstructed the bridge, removing all portions of the same except the piers and abutments, and substituting in lieu thereof a new structure of different plan and material, and far superior in strength and durability to the original bridge, and which new bridge is

especially adapted to the crossing of trains only, and is constructed upon a plan which renders it impossible to convert the new bridge into one for ordinary road travel without practically reconstructing the same. It is further alleged that for the purpose of paying for the construction of the new bridge, and discharging the existing indebtedness, the bridge company issued its bonds to the amount of one million dollars, which under the agreement aforesaid, the railway company guaranteed, and the two companies procured certain parties to purchase said bonds and invest money therein to the above amount, and the purchasers of said bonds bought the same and paid their money therefor relying upon the conditions existing as aforesaid and upon the construction of the powers, franchises and duties of the bridge company and the railway company; and that as part of the general arrangement for the reconstruction of the bridge, which had become necessary, on account of the increase in weight and size of rolling stock and improved methods of transportation, the bridge company made a new lease to the railway company about November 1, 1901, which was made solely with reference to railroad traffic over the bridge. Whereas if such claim as is now made by this proceeding had been made at that time, the railway company would not have entered into said new lease, or guaranteed said bonds. Wherefore, it would be inequitable and unjust, and would impose unreasonable burdens upon the business of the railway company to require the said bridge to be used for any other than strictly railroad purposes.

It is further averred that the process of reconstruction continued during many months (during the years 1894, 1895 and 1896), and during all that time, the reconstruction for exclusive railroad purposes was conducted in the presence of the citizens of Boonville and with the knowledge of the public generally, and especi-

ally with the knowledge of the duly constituted officers of the State of Missouri, and no objection was made and no claim set up that the bridge should be reconstructed so as to accommodate ordinary road travel, and that since said time, there has been no objection to its having been constructed so as to make it impracticable to use said bridge for ordinary road travel, nor has any other demand ever been made until the filing of the petition for this writ.

Wherefore, the respondents say that to make the alternative writ peremptory, and to do the things contemplated thereby, would impose unreasonable burdens upon the bridge company and the railway company without any corresponding advantage to the public, and would be requiring something on behalf of the public which a very small portion of the public desires to have done, and would be commanding the railway company to carry on a business not contemplated by its charter, and entirely beyond any powers conferred upon it by the law of this State or by the law of Kansas, under which it was organized and exists, and would require the bridge company to engage in a business which it has never yet engaged in, and which would entail loss upon the company operating it, and would require the bridge to be operated in a manner dangerous to the lives of persons and to the property of people crossing the same, and would unreasonably interfere with and delay traffic on the railroad, and would require both said companies to operate a bridge across a navigable stream under the jurisdiction of the United States without any lawful authority therefor, and would compel the respondents to violate the rights of the owners of the ferry across the Missouri river and involve the respondents in litigation with the owners of said ferry. It is further objected that the allegations of the alternative writ are vague and indefinite as to the location of the approaches, which it is claimed

heretofore existed, and which it is sought to have restored, and do not distinctly and clearly specify the acts and things which it is proposed to compel the respondents to do in that respect, wherefore, the relator is not entitled to the relief asked; and further it is objected that the alternative writ does not state facts sufficient to constitute a cause of action entitling the relator to the relief sought; and having made full return, the respondents pray that the alternative writ be quashed, and that they be discharged.

To these returns, the relator filed separate replications, by which it was admitted that the Missouri river, in 1870, was and ever since had been, and now is, a navigable stream; that during the years 1894, 1895 and 1896, the respondents reconstructed the Boonville bridge, and as reconstructed, it is superior in strength, durability and safety to the original bridge.

It is denied that there is any jealousy on the part of the merchants of Boonville towards those of New Franklin, or that this proceeding was instigated by said Boonville merchants.

It is then alleged that the respondents wrongfully closed the bridge and refused to permit the use of the same for ordinary road travel, in order to give the railway company a monopoly of the passenger and freight traffic, and of all other railroad business, from the county of Howard and the other counties lying north of the Missouri river tributary to said bridge, and that by reason thereof, the people of the north side of the Missouri river have been compelled to pay the railway company exorbitant charges for having their produce shipped over the respondent's railroad, and that the greater portion of the losses suffered by reason of said wrongful monopoly from closing said bridge to ordinary road travel is borne by the citizens of Howard county. The reply again reiterates the allegations of the writ concerning the lease of the

bridge to the railway company, and adds: "And relator says, by reason of the premises and by reason of the further fact that the said railway company has, ever since the date of said lease, as alleged in the separate returns of both said respondents, received, collected and exacted tolls for the crossing of passengers and freight over said bridge on its trains, it should be estopped from denying the powers given and granted by said lease, and from asserting that under and by virtue of said lease the said railway company did not have, and has not now, full power and authority to maintain and operate said bridge for both the purposes specified in the charter of said bridge company, to-wit, the power and authority to maintain and operate said bridge for both railroad and ordinary road travel."

It is also alleged that the bridge company having applied to and obtained from the State of Missouri a charter to construct a public toll bridge as alleged in the alternative writ, and having constructed and maintained and operated said bridge under and by virtue of the powers conferred upon it by the said charter for a long period of time, and the railway company having entered into a lease with the bridge company as alleged in the writ, and having taken possession of the bridge and used and operated the same under said lease, and having charged and exacted toll from the public for a period of thirty years, as alleged in the returns of the respondents, "that both said respondents should not now be heard to say that the State of Missouri did not have the power to grant the privilege and franchise so exercised as aforesaid, or that full power and authority was not derived under said charter to construct, use, maintain and operate said bridge for both ordinary road travel and railroad traffic, nor should the respondent railway company, by reason of the premises aforesaid, be heard to say that its right to so use, maintain and operate said bridge for both said purposes, is any-

wise curtailed or restricted by the laws of the State of Kansas or of the United States.''

The relator further says that he has not sufficient knowledge to form a belief as to whether a new lease was entered into between the respondents, or bonds issued and sold as alleged in the returns, but he avers that if such new lease was entered into and bonds issued and sold, it was long after the reconstruction of said bridge had been completed, and after respondents had learned that a proceeding would be instituted by the State to compel the opening of said bridge to ordinary road travel, and if any such lease was made or any bonds were sold, it was with full knowledge of the parties to the lease and the purchasers of the bonds that proceedings were about to be instituted by the State to compel the opening of said bridge to ordinary road travel.

All other allegations made in the returns not admitted were denied, and it was further charged that the returns were redundant, irrelevant and insufficient to constitute any defense, and the ''relator again prays that said respondents and each of them be commanded to reconstruct proper approaches to said bridge; that they refloor and so provide and equip the same that it may accommodate ordinary road travel as well as railroad traffic, and that said bridge be opened to ordinary road travel and at reasonable rates of toll.''

Upon the issues thus presented by the returns of the respondents and the replies of the relator, this court appointed the Honorable James E. Hazell commissioner to take the testimony and make report. In pursuance of such appointment the commissioner heard testimony at various times and places, which testimony taken, together with the exhibits and the report of the commissioner, was duly filed in this court. The testimony taken is very voluminous and we shall not undertake to give it in detail. We have read and considered

with a great deal of care and interest the volume of testimony as returned by the learned commissioner, and we must be content with a statement of the leading features of the testimony as applicable to this proceeding. The testimony upon the hearings before the commissioner tended to prove substantially the following state of facts:

The respondent, the Boonville Railroad Bridge Company, was incorporated under article 7, chapter 37, Wagner's Statutes of Missouri, of 1870, relating to manufacturing and business purposes (being the same as art. 9, chap. 12, R. S. 1899), by articles of association executed and filed in the office of the Secretary of State on December 19, 1870. The preamble to the articles of association recited: "for the purpose of organizing a company to construct, maintain and operate a toll bridge across the Missouri river from a point in or near the city of Boonville, in the county and State aforesaid, to a point in or near the town of Franklin, in the county of Howard, in the same State, for public use and crossing persons and property by both railroad and ordinary road travel in accordance with the laws of the State of Missouri (see chap. 37, art. 7 of the statute laws of said State) do enter into the following articles of association." The fourth clause of the articles reads as follows:

"The said bridge is to be a public toll one for crossing persons and property and is to be used for both railroad and ordinary road travel at reasonable rates."

Subsequently as authority and permission to construct and maintain a bridge over the Missouri river between the city of Boonville, in Cooper county, and Franklin, in Howard county, Missouri, an Act of Congress was passed and approved May 11, 1872 (U. S. Stat. at Large, vol. 17, p. 99), whereby it was enacted: "That the Boonville Railroad Bridge Company, a corporation existing under the laws of the State of

Missouri, be and is hereby authorized to construct and maintain a bridge over the Missouri river between the city of Boonville, in Cooper county, and Franklin, in Howard county, in said State, and to lay on or over said bridge railway track for the more perfect connection of any railroads that are, or shall be, constructed over the said river at or opposite said point, under the limitations and conditions hereinafter provided."

Section 4 of the act provides: "That all railway companies desiring to use the said bridge shall have and be entitled to equal rights and privileges in the passage of the same and the use of the machinery and fixtures thereof, and of the approaches thereto, under and upon such terms and conditions as shall be prescribed by the Secretary of War, upon hearing the allegations and proofs of the parties in case they shall not agree."

At the time of the organization of the bridge company and the enactment of the above-mentioned law of Congress, the Missouri, Kansas & Texas Railroad, or the Tebo & Neosho Railroad, as it was originally called, was in course of construction upon both the north and south sides of the Missouri river. The railway company had procured the right of way by conveyance of the owner of the land in Howard county, Missouri, by deed from J. Broaddus Smith and wife, extending from the north to the bank of the river or the slough hereafter mentioned, at a point about where the station of Kingsbury is now located. On the south side of the river in the city of Boonville, the railway company had also acquired by condemnation a right of way one hundred feet wide, extending from the south bank of the Missouri river, in a southerly direction, beyond Water street and thence through the limits of the city of Boonville. Prior to the year 1870, the Missouri river had cut away a considerable tract of land in Howard county opposite Boonville where the town

of Old Franklin had formerly stood, and for many years the channel of the river was along the north bank where the station of Kingsbury now is, opposite Boonville. Gradually an island had formed in the river above the place where the bridge was afterwards located, and had gradually increased at its lower end until the point of the island had, in 1872, extended so far down stream as to be opposite the city of Boonville, and had grown to such an extent that, except in high water, a considerable portion of this lower end of the island was exposed, but there still remained a channel or slough between the island and what had been for a long time the north bank of the river, into which steamboats frequently entered and made their landings. The bridge or the embankment or dike, belonging to the same, upon which the railroad track is laid to connect the bridge with the railroad track terminating on the right of way acquired from Smith at a point near Kingsbury, were located across this lower end of the island and a map of the location was prepared about 1872 by Capt. Ravennel, then connected with the engineering corps of the bridge company, and was furnished to the U. S. War Department. From this map and from the testimony of Capt. Ravennel and others, it is established that at the time of the construction of the bridge and the embankment connected therewith, the bar at the lower end of the island for the greater distance traversed by the bridge embankment was not sufficiently solid to support the weight of a man, and the engineers were not able to walk across the same in order to lay out the work, but were compelled to wait for winter that it might freeze up and thus enable them to pass over the same in doing their work. This island belonged to Capt. John Porter, who owned and operated a ferryboat between Boonville and Howard county. Under an act of the General Assembly of Missouri, approved February 11, 1861, it was provided that

"John Porter, his associates, heirs and assigns are hereby authorized to keep a public ferry across the Missouri river, opposite the city of Boonville, in Cooper county, for a term of fifty years, and to have the exclusive right of keeping a ferry at said point for a distance of one mile below the city of Boonville and one mile above, on each side of said river." Capt. Porter claimed the exclusive right to transfer people, vehicles and teams across the Missouri river within those limits, and insisted that any attempt by the bridge company to cross people or freight otherwise than in trains or cars would be a violation of his rights, and threatened litigation against the bridge company if it undertook to engage in such business which he claimed to belong exclusively to him. He being the owner of the island lying between the two main banks of the river, it was necessary to procure a right of way from him in order to construct the bridge. Such right of way was acquired by a deed, dated March 14, 1873, whereby Porter and wife conveyed to the Boonville Railroad Bridge Company a strip of ground two hundred feet wide across the island in the Missouri river, as located by the engineer of said company, "to have and to hold the premises hereby conveyed with all the rights, privileges and appurtenances thereto belonging or in anywise appertaining, unto the Boonville Railroad Bridge Company, its successors and assigns, as long as the same may be used for railroad bridge purposes." The bridge company, in the latter part of 1872, entered into a contract for the construction of the bridge with the American Bridge Company, whose business was manufacturing and erecting bridges of that character. The bridge company acquired no property or right of way or easement of any kind on the south side of the Missouri river. The south abutment of the bridge is about fifty feet from the water line of the river. The bridge extends from the south pier in the river to this

abutment, and then there is a solid embankment extending about eighteen or twenty feet still south of the abutment; this embankment is confined by a solid masonry retaining wall, and it and the south abutment are located entirely on the railroad right of way. Then south of that is the Missouri Pacific track that runs along the south side of the Missouri river, the M. K. & T. R. R. track spanning this upon a trestle as it approaches the south end of the bridge. From this trestle over the Missouri Pacific track, travel would necessarily be along the M. K. & T. track to Water street. There is a conflict in the views of counsel for relator and for respondents as to the distance between the south end of the bridge and Water street; the respondents say the correct measurement is 261 feet and the relator claims that the distance is 211 feet and 3 inches to the middle of Water street; however, it is not vitally material as to which one is correct as to these measurements.

Under the above conditions and with the right of way and franchises acquired by the bridge company and the use of a portion of the right of way of the railway company in the city of Boonville, or on the south side of the river, the bridge company caused the construction of the bridge to be commenced by the American Bridge Company, to which the contract had been let. The character of construction originally adopted would admit of the joint use of the bridge for railroad purposes and road travel, and a floor was laid in the bridge and railings were constructed along the sides, and the same were so far completed that the bridge might have been used for road travel if the necessary approaches had been built. A small house was built on the railroad right of way near the south end of the bridge, which is now used for the accommodation of the

men who operate the bridge, it being necessary to maintain three or four men in order to have up steam in the engine that is used for turning the draw of the bridge in case of the approach of a boat. This house was so located that it might have been used for a toll house if desired, and was referred to by some of the witnesses as a "ticket office or gatekeeper's office." At the north end of the bridge, there was a roadway constructed on the east side of the embankment, extending several hundred feet from the end of the bridge and curving to the right or eastwardly, but all confined within the two hundred feet right of way acquired by the bridge company, and not connected with any other road, either public or private. There was some conflict in the testimony concerning the original purpose of this inclined road along the side of the embankment, and as to the accessibility to the same from certain roadways which will be mentioned later in connection with other evidence upon another branch of the case, but which it is not material to pursue now for the reason that the evidence fairly establishes that, when the construction of the bridge was commenced, it was the purpose of the directors of the bridge company to construct and equip it for wagon and general road travel. While the bridge was in course of construction, Captain Porter, the owner of the ferryboat, entered protest against the use of the bridge for such purposes, and threatened to institute legal proceedings against the bridge company to prohibit such use as being in conflict with what he claimed to be his exclusive right to convey such travel across the Missouri river at Boonville. The bridge company being under the necessity of acquiring its right of way across "the island" from Captain Porter, and being threatened with litigation, the matter was submitted to the legal advisers of the company, at that time consisting in part of Judge Sears, general counsel, John Montgomery, Jr., general attorney,

and John Cosgrove, attorney at Boonville. Messrs. Montgomery and Cosgrove, after examining the question, rendered their opinion to Judge Sears to the effect that the bridge company might lawfully engage in the business of passing persons and vehicles over the bridge and charge toll for the same. Judge Sears, however, upon a view of the whole subject, took a contrary view and advised the directors of the bridge company against opening the bridge for such traffic. At about the same time, an effort was made by Capt. Jos. L. Stephens of Boonville, who was a director of the bridge company, and who was also a creditor of Captain Porter in a large amount and supposed to have a lien on the ferryboat and other property belonging to Porter, to effect a compromise of the matter between the bridge company and Captain Porter, the general nature of which was that the bridge company should pay Captain Porter forty thousand dollars for the ferry, and then enter into a contract with him, leasing to him the bridge for a term of years at a nominal rental, and allow him to collect the tolls and make what he could out of it. This proposition was rejected by the bridge company as unreasonable, and for these various reasons, it was then determined by the bridge company that it would not undertake to carry on the business of a bridge for general road purposes, but would confine its business exclusively to the crossing of railroad trains and the people and freight in the cars. Thereupon such of the construction as was designated for general road travel was abandoned and a painted sign was posted and maintained at each end of the bridge, reading: "This bridge is not open for general travel."

On the first day of May, 1873, the bridge company leased the bridge to the Missouri, Kansas & Texas Railway Company, one of the respondents herein, for a term equal to the full term of the corporate existence

of the bridge company, the property referred to being the bridge, which the bridge company "is authorized to construct and maintain under and by virtue of the laws of Missouri and the act of Congress aforesaid (act of May 11, 1872)" and then gives a mere formal description of the property, it being stipulated in the lease, among other things, that the railroad company covenants and agrees that it should, during the continuance of the lease, "use and operate the said bridge and the said demised premises and appurtenances for the business and purposes for which the same are constructed, and in such efficient manner as to satisfy the lawful and reasonable demands of the public, and will also fulfill and perform all the requirements which are now or hereafter may be imposed on the party of the first part with respect to the said demised premises and especially of the act of Congress aforesaid, or of the State of Missouri, now existing or which may be hereafter enacted."

The construction company finished the bridge in 1875, but under the contract with the bridge company, it was entitled to retain possession of the bridge until it was fully paid for, and for that reason, it retained control and possession of the bridge until the summer of 1876, when it turned the same over to the railroad company as lessee. During the time the bridge was in the control of the American Bridge Company, and after it was turned over to the railroad company, all persons were prohibited from passing over the bridge. Notwithstanding such prohibition, however, a number of people did pass under different circumstances. Sometimes they would elude the guards in charge of the bridge, who had instructions not to allow anyone to pass, but notwithstanding such instructions, it was intimated by some of the witnesses that they crossed the bridge at times when the guards apparently made no effort to prevent them. Various devices and vari-

ous subterfuges were resorted to to get over the bridge contrary to the instructions that had been given. At one time, but whether this was during the time the construction company was in control or afterwards does not appear, the guards had become lax in the performance of their duty, and more positive instructions were given to prevent any crossing from that time forward, after which crossing was much less frequent. A number of the directors of the bridge company were residents of Boonville. On two occasions, when the ferryboat was not running, permission was given to allow two funerals to pass over the bridge as a special favor to the relatives of the deceased persons, who were prominent citizens and friends of the directors resident in Boonville. These were the only cases of any one passing with the consent of any one connected with the bridge. A couple of doctors testified to having crossed the bridge in buggies. A few others crossed on horseback. None of them stopped to ask permission, but drove onto the bridge and then proceeeded with such speed as to render interference by the guards impossible. There was no use of the bridge for crossing other than of the cases mentioned above. None of the persons so crossing the bridge ever paid any toll. The testimony establishes that no toll was ever paid by any one or demanded from any one by any one connected either with the construction company, the bridge company, or the railroad company. Prior to 1880, the Missouri, Kansas & Texas Railroad Company had passed into the control of the Missouri Pacific Railroad Company, or Mr. Gould, and with it all leased property, including the Boonville bridge. In that year the floor of the bridge was taken up in order to lay new ties under the railroad track across the bridge, and it was never replaced, and from that time down to the present,

the bridge had existed without any flooring whatever, having simply the stringers and the ties resting on the same, and the iron rails on the ties, with a plank along the middle to enable the men operating the bridge to pass back and forth over the same, which is necessary, and which is done after the passing of every train in order to avoid danger from fire. Prior to 1894 the M. K. & T. Ry. Co had retaken possession of its property from the Missouri Pacific, or from the Gould interests, and as a part of the same it had taken possession of the Boonville Railroad Bridge as lessee thereof. During the years 1894, 1895 and 1896 the bridge had become inadequate for the character of equipment used on the railroad and was not sufficient to carry engines and trains of the weight that were then operated. It was therefore necessary to reconstruct the bridge. At the time of the original construction, the bridge company had issued its bonds to the amount of one million dollars, which were secured by mortgage upon the property of the bridge company, which lien still existed at the time it was found necessary to reconstruct the bridge. It was necessary to have additional money to effect the reconstruction. The M. K. & T. Ry. Co., as the lessee at that time, had become owner of practically all the stock of the bridge company, and it was then arranged that the railway company should assist in the reconstruction of the bridge, and at the proper time new bonds and mortgage would be executed and a new lease entered into, all of which was done November 1, 1901, the general nature of which transaction was that the bridge company issued new bonds to the amount of one million dollars and that the railroad company guaranteed the payment of the principal and interest of the same. Travel was prohibited during all the time the old bridge existed with its floor; after the floor was removed and after the new bridge was constructed, no action was ever taken to require the bridge company, or the

railway company as lessee, to open the bridge for public travel. Several of the plaintiff's witnesses testified that at different times the matter was agitated among the citizens of Boonville, and the subject was presented in the form of a request to the original resident directors of the bridge company, where the matter seemed to die. The new bridge built in 1894-96 was of altogether a different pattern, being constructed especially with reference to the crossing of heavy railroad trains, being about two feet narrower than the old bridge, which was about twenty feet, and having its members of much greater size but much farther apart than those of the old bridge, so that as reconstructed, the bridge is not adapted to use for road travel, and in order to convert it into a wagon bridge, it is necessary to make material and expensive alterations in and additions to the bridge as now constructed. During the process of this reconstruction, no objection was made by the people of Boonville, nor by any public officer, either of the city, county or State. This proceeding, commenced long after the reconstruction of the bridge was entirely completed, is the first action ever taken to assert the alleged right of the public to use the bridge for general road travel. In 1895, the citizens of Boonville caused a proceeding to be commenced before the railroad commissioners of Missouri relative to charges exacted for crossing freight and passengers over the Boonville Railroad Bridge. It is unnecessary to give any consideration to that proceeding. The evident purpose of showing that a proceeding had been commenced of that character was to negative any intent on the part of the citizens of Boonville or the State officials to assert the claims and right sought to be enforced by the proceedings in the case at bar.

The bonds mentioned, issued and secured by the mortgage of 1901, were placed on the market and are being dealt in by the public as other similar securities

are. The bridge in question has been assessed since its original completion by the county courts of Cooper and Howard counties and by the State Board of Equalization as a "railroad bridge" under the provisions of the revenue law, — now known as art, 9, chap. 149, R. S. 1899 — and taxes collected on the same. The railroad company, under a modification of the original lease made in 1873, had collected tolls from passengers and freight crossing this bridge in trains, which collections had been made by virtue of the franchise of the bridge company.

Two witnesses for the relator, Mr. Ravennel, a civil engineer, and Mr. Hiram Phillips, president of the Board of Public Improvements of the city of St. Louis, who had been employed for a time in the civil engineer's office of one of the larger bridge building companies of the country, testified that in order to equip the present bridge for general road travel, it would require the addition of steel stringers running lengthwise of the bridge on which to rest joists to support the floor, and on top of which would have to be laid the floor, extending over the entire width of the bridge, and side railings would have to be constructed along each side of the bridge as a precaution against people or animals falling off. This alteration was estimated by Mr. Phillips, roughly, to cost about twenty-five thousand dollars. These engineers also testified that bridges were built with a certain factor of safety; that is, that it was estimated that the greatest load they would have to carry in the use for which they were designed would be a given weight, and that in order to be entirely safe to sustain that weight under all circumstances, the structure would have the capacity of carrying several times such weight, usually about five times the actual weight of the largest load to which it would be subjected. Five was therefore assumed to be the factor of safety in this case. The weight of the bridge itself enters into this

calculation, and to add to the weight of the bridge materially will reduce the factor of safety. While it was the opinion of these two witnesses that the additional weight that would be added by adding the other material necessary to equip the bridge for road travel would not render it unsafe, yet it would reduce the factor of safety below the limit adopted in the construction of the bridge, and to that extent would impair its efficiency and safety. The evidence of a number of witnesses tends to establish that the development of the railroad business is from year to year creating the necessity for heavier rolling stock and cars of greater load capacity, which, in itself, is an increase upon the strain that is put upon the bridge.

The relator introduced evidence concerning the service furnished by the ferryboat. This was objected to by respondents. Some of the witnesses testified that the service was unsatisfactory; that the ferryboat commenced to make trips at six or seven o'clock in the morning and stopped at six o'clock at night, and that after that time the only way to get over was in a skiff; that there were days when the ferryboat did not run at all, sometimes because of high winds, sometimes because the river was frozen over, and on other occasions the boat would get aground, and be detained for hours at a time. The opinion was expressed by some of relator's witnesses that the service was not as good as it had been in years past when Captain Porter was alive and operated the boat. Other witnesses were of the opinion that the service was practically the same in proportion to the amount of business; that the conditions of the weather and river at the different seasons were substantially the same now as they had always been and that they had interfered with the operation of the ferryboat in years past just as they do now. A number of witnesses, both for relator and respondent, testified that the service given was as good as could be expected

in view of the amount of patronage enjoyed by the boat.
The party operating the boat for the owner testified
that he gave as good service as the business would
justify; that he made regular trips, and if there was
anyone to cross in the meantime, he would take them
over, and that whenever there was business to do, and
the elements would permit, it was to the interest of the
persons owning and operating the ferryboat to run it,
and they would gladly do so whenever there was enough
business to pay the expense of making the trip.

The evidence established that prior to the building
of what is now the M. K. & T. railroad, about 1873, and
for several years later, there was a large immigration
into Missouri and States and Territories to the west
and southwest, and that a large part of this travel came
overland in wagons, and a very considerable portion of
it crossed the Missouri river at Boonville, but that the
country had filled up and this immigration ceased, and
a great deal of the travel through the country was done
on the railroads, and therefore the amount of crossing
of the river in vehicles of different kinds was very much
less than it had been in former years.

There was a difference of opinion among the wit-
nesses, they being about equally divided, concernng any
advantages that would arise to the public if the bridge
was opened for general road travel. From the testi-
mony of all of the witnesses it is fairly deduced that
the Missouri, Kansas & Eastern Railway was construc-
ted about the year 1892, this road being now the line of
the Missouri, Kansas & Texas Railway Company into
the city of St. Louis. The junction of this line with
the other line of the M. K. & T. railroad is at New
Franklin, across the river from Boonville, and only a
few miles distant therefrom. When this St. Louis line
was built, and the junction established near the town of
New Franklin in Howard county, a roundhouse was
located there, and it was made the terminus of several

divisions of the M., K. & T. railroad.  This brought to
that point a number of the train men employed by the
railroad company, and immediately New Franklin,
which was then a village of two or three hundred peo-
ple, commenced to grow, and at the time the evidence
was taken in this case, namely, the summer of 1902,
New Franklin contained a population of fifteen hundred
or more people, and was still a prosperous and growing
town, having within its limits a number of stores, carry-
ing various lines of goods, having newspapers, banks,
hotels, livery stables, lumber yards, implement stores,
grocery, dry goods, clothing, boots and shoes, millinery
and drug stores, and, of course, several saloons.  There
were also a number of churches and good schools. With
the development of the town of New Franklin, a con-
siderable portion of the trade which had formally gone
to Boonville, was diverted therefrom, and many peo-
ple in Howard county who had formerly done their
trading at Boonville now do it at New Franklin.  There
were a number of witnesses, some from Boonville and
some from Howard county, who testified on behalf of
the relator that it would be an advantage to have the
bridge opened.  Various reasons were given for this
opinion. A few thought that they could buy goods cheap-
er in Boonville than in New Franklin, or other towns in
Howard county.   Others preferred to trade in Boon-
ville because they had been in the habit of doing so, and
if they had the bridge they would not have to wait for
the ferryboat.   Others frankly admitted that the ad-
vantage of having the bridge was to better enable the
merchants of Boonville to compete with those of New
Franklin.  Some thought that it would be an advantage
as it would enable the people living in Howard county
to go to the theater occasionally in Boonville.   One
gentleman thought it would be an advantage because
they could hire some of the idle negroes in Boonville
and get them to work in Howard county, while another

gentleman thought it would be a disadvantage in making it easy for the criminal element of Boonville to invade Howard county.  When the witnesses were interrogated as to what was meant when it was said that there was a "demand" on the part of the people for the opening of the bridge, it was explained fully by Professor Johnson, of Boonville, who said that by a demand they meant an "expressed desire" to have the bridge opened.    Some of the witnesses admitted that that desire arose from the fact that they understood that the charter of the bridge company provided that the bridge was to be used for road travel, and they thought the company should be compelled to open it for that reason alone.  Many citizens of Howard county, some living in New Franklin, and others outside of that town, were equally positive that it would be of no advantage, — to anyone living on that side, at least, — to have the bridge opened; that all the necessities of the public could be supplied by the stores in New Franklin; that the market for produce of various kinds was better in New Franklin than it was in Boonville; that if people from Howard county were to take their produce to Boonville to sell, they would come in competition with the producers of Cooper county as well as such portion of the Howard county people as might go to Boonville, whereas at New Franklin, they only came in competition with the people of Howard county.  It was also shown that in former years a great many people carried poultry, eggs, butter and vegetables across the ferryboat to Boonville, but that since New Franklin had grown to its present size, all that sort of traffic had stopped, and that now people going to Boonville would dispose of their produce at New Franklin before going over to Boonville.  So far as the necessities or convenience of the several localities were concerned, the evidence establishes that the M. K. & T. railroad passes from the river northwardly through Franklin Junction,

Estill, Talbot Station, Fayette, Burton, and thence to
Higbee in Randolph county; that the St. Louis line of
that road passed eastwardly along the north line of
the Missouri river from Franklin Junction through the
town of New Franklin and through two other stations,
Pearsons and Lloyds, thence to Rocheport on the line
between Howard and Boone counties; that in addition
to the above railroad facilities, the C. & A. Railway
crosses the M. K. & T. at Higbee, and then passes in a
southwesterly direction across the northern part of
Howard county, crossing the Missouri river at Glas-
gow; that they also have the Missouri river, making a
large curve around the west and south sides of Howard
county; that there is a boat regularly engaged in the
transportation of grain crops and by means of which
most of the wheat grown along the river bottom is
transported to the Sombart Mills in Boonville. The
railroad stations along the M., K. & T. are only a few
miles apart. Fayette is the county seat of Howard
county, twelve miles distant from Boonville. The vari-
ous railroad stations are equipped for handling live
stock and grain, and for receiving freight of all kinds.
Parties desiring to ship freight of any kind into How-
ard county can do so by shipping directly to any one of
the various stations, and any one desiring to ship grain
or stock of any kind, either to St. Louis, Chicago or
Kansas City, can do so without crossing to Boonville
and shipping from that place, — the M. K. & T., either
directly or through its immediate connections, afford-
ing direct lines of communication between various
points in Howard county and the large markets of the
country. The farmers either ship their grain and stock
themselves or sell to dealers, but in either case, the de-
deliveries are made at these various stations along the
lines of railroad in Howard county, and the shipments,
whether of grain or live stock, go directly from such
shipping points to the markets, and it would be out of

the way to haul or drive to Boonville, and it would be more expensive to do so. The witnesses for both sides agreed that even if the bridge were open for general road travel, the crops and the live stock of both counties would be shipped just as they are now, and that no one would haul grain or drive live stock across the bridge and pay a toll for doing so in order to ship from Boonville. It was shown that the rates are substantially the same from the stations in Howard county to the various markets of the country as they are from Boonville, and that to haul or drive to Boonville in order to ship would simply add the expense of hauling and driving, together with the bridge toll, to the cost of marketing grain or cattle. Two or three witnesses testified that it would be an advantage if the bridge were opened to parties who occasionally desire to cross a blooded animal or a bunch of cattle, purchased in one county for grazing or feeding in the other county, but it was admitted that there was very little traffic of this kind.

One of the relator's witnesses made an estimate of the cost of operating the bridge if changed to a wagon bridge, upon the theory that it would only require, all told, four men. The testimony of the men now engaged in operating the bridge was that it required all the time three and some times four men at present, and that these men were necessary independently of parties that would be required to collect tolls and look after that part of the bridge connected with wagon travel. The testimony was that in addition to the present force, it would require at least one man at each end of the bridge all the time, which, at the least, would be two at each end. An estimate was made of the expense of maintaining the extra force and the interest on the cost of making the changes in the bridge, and the wear and tear of necessary repairs, but it was admitted that this was an estimate made without accurate information,

and it was conceded to be probably less than it should be. No means were disclosed of ascertaining what the bridge would earn in tolls from road travel if it was opened for that purpose. There was a difference of opinion expressed, some men thinking that it might earn enough to pay the expenses, while others were satisfied that it would not. It was established by the evidence that the subject of building a large bridge across the river at Boonville similar to the bridge at Jefferson City for the use of road travel alone had been agitated in Boonville, but it had been abandoned because everyone was satisfied that the business would not justify it and that the travel over the bridge would not produce enough revenue to defray the expenses.

It was agreed by the witnesses that no attempt had ever been made and no proceedings of any kind instituted to secure more efficient service by the steam ferry. The respondents introduced in evidence a letter from Miss Brent, heir to Captain Porter, and the present owner of the ferryboat, addressed to Mr. Allen, Vice-President and General Manager of the M., K. & T. Ry. Co., notifying him that she claimed the exclusive right to transfer passengers and teams, etc., across the Missouri river at Boonville, and that if the railroad bridge is opened for such traffic, she would institute legal proceedings to prevent the same and to protect her rights.

Concerning the physical conditions, the location of roads, etc., at either end of the bridge, the evidence established that Water street was the nearest practical route for passing to and from the bridge on the Boonville side; that this street was located more than two hundred feet south of the south end of the bridge, which was fifty or more feet south of the south bank of the river, and that the travel to and from the bridge would have to pass over the railroad right of way and along the tracts of the railroad to Water street; that the railroad track between the end of the bridge and the depot

building in Boonville is on a reverse curve and through a deep cut; that in this cut there is a side track; that an approaching train cannot be seen until it gets very near Water street, and that a person on an engine cannot see very far ahead through this reverse curve, and cannot see through the bridge until the engine is about upon the bridge.

The bridge is nearly eighteen hundred feet long, and the dike across the island and slough from the end of the bridge to the main bank near Kingsbury is nearly half a mile long, the right of way on which this dike is constructed being the strip two hundred feet wide acquired from Captain Porter under the deed previously mentioned. The ferryboat lands at various points along the river from the bridge down to a place called Michel's store about a quarter of a mile below the bridge,— these landings varying according to the stage of the water. Witnesses for relator testified about two roads that had been used for many years by people in passing to and from the ferryboat, the claim of relator's attorneys being that these are public roads. One of them extends along the river side of the island from Michel's store up to the bridge, and passing under the bridge, goes up the island to a small farm belonging to the heirs of Captain Porter, and occupied and cultivated by their tenants. The land along the side of the island where this road extends from Michel's store to the bridge is higher than it is towards the main shore near Kingsbury, it gradually receding from the river side of the slough. The evidence shows that this road was used by permission of Captain Porter and his heirs as owners of the island, as an outlet for the tenants on the upper end of the island and for the purpose of hauling wood from above the bridge, and also to enable the patrons of the ferryboat to reach the different points where it landed from time to time. The other road spoken of by the relator's witnesses was one along the

right of way of the bridge company across the island. This line of travel was at the foot and upon the incline of the embankment, and upon the company's side of a fence dividing the right of way from a field that had been inclosed on the lower part of the island. The road is a more direct line from Kingsbury to the end of the bridge than it is to go around by way of Michel's store, but it cannot be used at all seasons of the year on account of water standing over the lower part of the island and in the slough. There was a difference in the testimony of the witnesses as to where this water comes from, some of the relator's witnesses claiming that it is water which seeps through the dike or embankment built by the bridge company across the island and slough, in consequence of the river water standing upon the upper side of the embankment in the case of high water. Other witnesses testified that it was and is simply the water from the river backed up into the slough, the lower end of which was and is at or near Michel's store. Both of these roads had been used under the circumstances and for the purposes above mentioned for more than ten years prior to the giving of the testimony, namely, in 1902.

The inclined road that was constructed on the lower or east side of the dike or embankment and which had been staked out by Captain Ravennel when he was employed as civil engineer for the bridge company, did not connect with either of the roads previously mentioned. This inclined driveway started on the east or down-stream side of the embankment a short distance from the north end of the bridge. There is some conflict in the testimony as to the grade of this approach. One of the witnesses, a civil engineer, in answer to the question as to whether it afforded an easy access to the bridge, stated: "I couldn't say easy access for a loaded wagon or anything of that kind; it makes a very good grade though — decent grade." As it went north

and declined, it went farther away from the line of the track on top of the embankment, but it diverged more than necessarily resulted from the decline on the side of the embankment, and before it had gotten entirely to the bottom of the embankment, it had commenced to curve to the right, and terminated at the general surface of the ground within the limits of the two hundred feet right of way about four hundred feet from the end of the bridge, at which point, at the time it was constructed, the soft and impassable portion of the island commenced. A team going down this incline would pass from the end of it on to the land belonging to Captain Porter, and by traveling for some distance across his land, would come to the wagon track used in passing up and down the river side of the island, as previously explained. Captain Ravennel testified that he understood that this incline was laid out as an approach to the bridge. A couple of witnesses, Mr. Jacobs and Mr. Randecker, now in charge of the bridge and the engine and machinery for operating the same, originally went to Boonville in the employ of the American Bridge Company, and have been there practically ever since. They were familiar with the work of constructing the bridge, and testified that a large part of the material of the original bridge was landed upon the north or Howard county side of the river, and this incline was built simply for the purpose of conveying material from the boat landing to the top of the embankment, and thence to be carried out onto the bridge during the process of construction, and that for that reason the incline curved to the right as it descended, in order to carry the travel over it towards the river.

In regard to the feasibility of using the bridge jointly for railroad and ordinary wagon travel, and concerning the inconvenience and disadvantage that such use would be to the railroad company, the relator proved that it required about seven minutes for a train

to cross the bridge, and that there were about twenty-four schedule trains crossing the bridge every day, and that consequently only a few hours each day was consumed in the actual passing of trains. The testimony on the part of the respondent in this respect showed that it was impossible to have these trains to arrive on schedule time, and that it could not be told just when they would arrive; that while there were certain trains scheduled for each day, yet it was the fact that there were many special and extra trains over the road that could not have schedule time, and that freight trains would be run in several sections, that is, while the train was scheduled under a certain number and to arrive at a certain time, yet because there would be too many cars to go in one train, a number of trains would be made up and designated sections; that sometimes there would be two or three sections and frequently as many as six or seven sections of the same train, which would all carry the same train number with the additional number for the section; that these trains would sometimes be near together, probably not more than ten minutes apart, and that sometimes they would be hours apart; that frequently the switch engines from Franklin Junction would have occasion to run across the bridge to Boonville, and for that there was no schedule or card time. It was also shown that going south from the bridge through the cut and around the curve before mentioned, and then on through the city of Boonville and for several miles into the country, the track was on a heavy grade south from the bridge, and that it was difficult for freight trains, and sometimes for heavy passenger trains, to get up that hill; that in order to do so, it was necessary for them to have "a run;" that there was a watering place for the engines at Boonville, and when they took water there, it was necessary to leave the train standing on the bridge, uncouple the engine, then go and get water and run back to the train

in order to have the advantage of the run across the
bridge and get the headway to get over the hill; that
when trains stopped to unload freight at Boonville, it
was necessary for them, before starting up this hill, to
run back onto the bridge in order to get the start; that
in almost every case, the trains would make a run and
stall on the hill, and have to back down to the bridge
again and take another start, and sometimes this would
be repeated several times before a train could get out.
For these reasons, it was shown that it was impossible
to tell when it might be necessary for the bridge to be
occupied by a train, and that because of the inability
to get a clear view of the bridge from an engine or train,
or to get a clear view of the track from the bridge, it
would be very difficult to discover the presence of teams
and vehicles and people, either from or approaching the
bridge.

It was also shown that the bridge was not of sufficient
width to permit of the passing of railroad trains and
vehicles of any kind at the same time, and therefore if
a train was crossing, no animals or vehicles could cross
until the train had cleared the bridge, and *vice versa,*
if any animals or vehicles were on the bridge, a train
could not cross the same until such animals or vehicles
had gotten entirely over, and that waiting for the clear-
ing of the bridge in this way would cause great delay
to the movement of trains, some of which carried
freight, some express matter, some passengers, and
some United States mail for all points along the lines
of the M., K. & T. railroad and its connections, which
extended to all parts of the country, but which were es-
pecially relied upon by the people living in the central
part of Missouri for communication with St. Louis,
Chicago, Kansas City, and other points north, east and
west of this bridge, and also for all points in southwest
Missouri, and through a large part of Kansas, the prin-
cipal portion of the Indian Territory, and every point

of importance in the State of Texas. The respondents introduced a number of practical train men, who explained the use of the bridge by the railroad company and the necessities of such use, and that to attempt to operate the bridge for both railroad and wagon purposes would be very dangerous to the lives and property of persons attempting to cross the same. Respondents also presented the testimony of numerous experienced railroad men. They consisted of presidents, general managers and general superintendents of the various railroad systems in the United States. These were all shown to have been men of large railroad experience, having been engaged in the operation and charged with the management of railroads extending from Canada to Central America and from Pennsylvania to the Pacific coast, and familiar with the conditions and needs of railroads, and most of them having had experience in the use of bridges jointly by railroad and wagon traffic. The respondents also introduced W. L. Foster, one of the railroad commissioners of the State of Louisiana, who resides at Shreveport, where there is a bridge across the Red river used for both railroad and general road purposes, but which bridge is not nearly so long as the one in question over the Missouri river, but is somewhat similar in its conditions in that there is a grade extending from the bridge through the city of Shreveport, but not nearly so steep nor so long a grade as that at Boonville. The effect of the testimony of these witnesses was that it was not only very dangerous to use bridges jointly for railroad and wagon traffic, but that it was a great interruption of railroad traffic, and a great inconvenience and disadvantage to the same; that, among other things, it was considered a reasonable and almost necessary precaution that certain guardrails should be placed upon every railroad bridge, which was a great

206 Sup—9

aid in case a truck or a car should jump the track at any place on the bridge, the presence of such guardrails being calculated to throw the truck back on the track, or at least prevent the car from leaving the track entirely, which might result in great destruction. Upon a bridge used for wagon traffic, such guardrails must be dispensed with, and the railroad is therefore deprived of the precaution and safety arising from the location of guardrails. The consensus of the witnesses was that the condition of the track on account of curves and grades through the city of Boonville would make it especially dangerous to use that bridge for general road travel; that there would necessarily be delay in operating every train across that bridge even if there was no vehicle upon the bridge, whereas if one had started across, the train must be held until it had gotten out of the way because they could not pass on the bridge. These witnesses all agreed further that with the best of management and the utmost care, it was impossible to keep railroad trains on time; that for various reasons, on account of the weather, or on account of making connections with other roads, trains would be thrown off of time to a greater or less extent, and therefore it could not be certainly determined that a train would cross the bridge at any particular time; and further that the demands of the traveling public, and of shippers, as well as the demands of the Government in the mail service, were constantly increasing for rapid transit of all kinds, and that the railroad trains of the country were now scheduled at about the highest possible notch, and so high that if they were delayed a minute or two at any point, it was liable to put them off of their schedule throughout the balance of their trip, the time being so fast on many of the trains that it is impossible to make up any lost time; that such delays would result in the failure of making connections at various points to the great inconvenience

of the travelers as well as the mails, etc. On cross-examination, some of these witnesses testified that it was possible to put in a system of signals by semaphores or other electrical apparatus by which the approach of a train towards one end of the bridge could be announced at the other in time to prevent vehicles passing at the opposite end from the train, but that such arrangements were not satisfactory, and were very expensive, and would relieve but slightly against the inconvenience and dangers that would necessarily result from a joint use of the bridge. These witnesses testified that viewing the question from the standpoint of practical railroading, it would be such a disadvantage to a railroad that it could not be estimated in money; that it was so universally recognized to be contrary to good policy and good management in railroading, that roads that were subject to that inconvenience were endeavoring to free themselves from it, and that while twenty-five or thirty years or more ago, such schemes were projected and considered feasible, yet the development of the railroad business of the country has entirely outgrown the conditions which made such joint use even tolerable, and that the conditions of railroading and the business of the country generally had so changed that the subject could not be considered in the light of what had been done or suffered twenty-five years ago, and that no railroad company to-day would take upon itself to permit such inconvenience and disadvantages as would arise from the joint use of one of its bridges if it were possible by any means to avoid it.

These witnesses also testified that one train getting off its schedule on the road was liable to disarrange many and probably all of the trains, and was such a confusing element in the operation of a railroad that it was impossible to keep the trains on time.

The railroad company, in reconstructing the bridge

for the bridge company, had filled some trestle work on the north end of the bridge, and in doing so, had filled up the space through which the wagon road mentioned had formerly passed, and forced to travel onto an entirely different line and outside of the pier, or between the pier and the river bank.

Upon the evidence taken at the hearings in this cause upon the issues presented, the commissioner, after due consideration of the testimony before him, made his finding, which was, upon every material issue, in favor of the relator and against the respondents. We deem it unnecessary to reproduce the report in full of the finding of the commissioner. In due time the respondents filed exceptions to the finding of the commissioner as set forth in his report. We also are of the opinion that it is not essential to the disposition of this case to reproduce the exceptions filed to this report. This constitutes the record in this cause which is now before us for consideration. It now remains for this court to make its announcement upon this record, either making the alternative writ of mandamus peremptory or denying such writ.

## OPINION.

As indicated by the record before us this is a proceeding by the State at the relation of the Attorney-General in which the extraordinary writ of mandamus is sought to compel the opening of the Boonville Railroad Bridge for general road travel. The record before us is quite voluminous. Numerous witnesses were examined on the part of the relator as well as the respondents, and it is well enough to state at the very inception of the consideration of the questions disclosed by the record and so ably presented by counsel, both for the relator and the respondents, that we shall not undertake to reconcile the conflict in the testimony, nor shall we undertake to discuss in any way the

credibility of the witnesses testifying before the commissioner. We much prefer in the disposition of this proceeding to assume that the witnesses on both sides of this controversy are reputable citizens of the communities in which they reside. It is true that no one can read this record without it being manifest that this is a controversy in which two rival business communities have a deep personal interest, and we take it that the citizens of those communities are no exception to the general rule, that in expressing opinion as to what ought to be done on any public question their personal interests will at least in some degree influence the formation of such opinion; however, this does not affect the integrity and standing of such citizens, nor should it be regarded as impeaching in the least their reputation for truth and veracity.

This extraordinary writ which is sought in this proceeding has been very properly described as "the right arm of the law." It is therefore essential at the very inception of the discussion of the propositions presented for our consideration to determine the office of this writ and the purpose it was intended to accomplish. "Its principal office is not to inquire and investigate, but to command and execute. It was designed only to meet emergencies and prevent a failure of justice, and the courts have given expression to the view that this writ should be reserved for extraordinary occasions and require litigants to use all available means to obtain the enforcement of their rights before they apply to the court for the assistance of this writ." [Merrill on Mandamus, secs. 64, 67.]

The learned author just cited, in section 62, thus discusses the nature and character of this writ. He says: "This writ was originally, and still remains in England, a prerogative writ, and was issued at the discretion of the court. In America, at the present time, it is but seldom considered to be a prerogative writ.

Owing to the nature of our government or statutory provisions on the subject, it is generally considered as more of a writ of right, to be used in cases to which it applies, and is considered to be an ordinary action at law, and prosecuted in all respects as an ordinary action. But, whether it be called a prerogative writ, a writ of right, or an ordinary action at law, the authorities agree that the courts have a discretion whether they will issue or refuse the writ, even where a prima-facie right thereto is shown. Though there be no other remedy, the court will still exercise its discretion on the subject. Such discretion must be a sound discretion, guided by law. It must be governed by rule, not by humor. It must not be arbitrary, vague and fanciful, but legal and regular.''

Mr. High, in his standard work upon Extraordinary Legal Remedies (3 Ed.), section 9, in discussing this extraordinary writ, very clearly lays down the rule which should govern and control the court in the issuance of it. He says: ''The writ of mandamus being justly regarded as one of the highest writs known to our system of jurisprudence, it issues only where there is a clear and specific right to be enforced, or a duty which ought to be and can be performed, and where there is no other specific and adequate legal remedy. The right which it is sought to protect must therefore be clearly established, and the writ is never granted in doubtful cases. And the person seeking the relief must show a clear, legal right to have the thing sought by it done, and done in the manner and by the person sought to be coerced. The writ, if granted, must also be effectual as a remedy, and it must be within the power of the respondent, as well as be his duty, to do the act in question. It follows also, from the important position which this writ occupies as a remedial process, as well as from its nature as an extraordinary remedy, that the exercise of the jurisdiction rests, to a con-

siderable extent, in the sound discretion of the court, subject always to the well-settled principles which have been established by the courts, or fixed by legislative enactment. Cases may therefore arise where the applicant for relief has an undoubted legal right, for which mandamus is the appropriate remedy, but where the court may, in the exercise of a wise judicial discretion, still refuse the relief.''

The law applicable to the subject now under consideration is very clearly stated in Morawetz on Private Corporations, sec. 1134, where it is said: ''There are many cases, however, where the performance of a public duty by a corporation cannot be compelled by writ of mandamus, though the duty itself be clear. The propriety of issuing the writ of mandamus depends in part upon the character of the acts to be enforced. A court should never attempt to compel the specific performance of an obligation. And hence the writ of mandamus should not, as a rule, be issued in order to enforce the performance of a duty involving the exercise of a large measure of good faith and discretion on the part of the obligor. It may be doubted, therefore, whether it be a rule applicable in all cases, that the courts will compel a railroad company to operate its line of road, even though the duty of the company be clear. The difficulty of supervising unwilling agents in the performance of a continuing duty of so complicated a nature as that of properly managing a railroad, involving the exercise of a large amount of discretion and technical skill, would in many cases prove a serious obstacle in the way of such an attempt. Whether a writ of mandamus shall be issued, is in every case a matter resting largely in the discretion of the court, and depends upon all the surrounding facts and circumstances.''

The same learned author last cited, in further discussing this proposition (sec. 1136), says: ''If a rail-

road company should attempt to construct a railroad which it has no authority to construct, or if it should neglect to construct the railroad which its charter expressly or impliedly requires it to construct, the State may revoke the company's franchise, or restrain its unauthorized action. A grant of public aid to the company may likewise be annulled. But, although a railroad company be under an obligation to the State to construct the whole of its road, as well as to operate it after it has been built, it is questionable whether a court should undertake to enforce the performance of an obligation of this character by writ of mandamus; for the proper construction of a railroad would necessarily involve the exercise of much technical skill and judgment, and depend largely upon the good faith of the parties directing the work."

In 19 Am. and Eng. Ency. Law (2 Ed.), 751, in the text, we find this rule applicable to the issuance of this writ. It is thus stated: "The writ of mandamus is not a writ of right, and the granting or denial of an application for mandamus rests very largely within the discretion of the court. This discretion is not a purely arbitrary one, however, and cannot be capriciously exercised. It is a sound legal discretion to be exercised in accordance with the established rules of law, and if under those rules the party is entitled to the writ, the court has no discretion to withhold it. Indeed, many cases go so far as to call the writ a writ of right or in the nature of a writ of right. Mandamus, being a discretionary writ, will not be granted where it would work injustice, or introduce confusion and disorder, or operate harshly, or where it would not promote substantial justice."

Spelling on Injunctions and Other Extraordinary Remedies (2 Ed.), vol. 2, sec. 1371, in treating of this subject is in entire harmony with the authorities herein cited. He says: "But even where a clear legal right

is shown, the exercise of jurisdiction to grant this extraordinary remedy rests, to a considerable extent, within the sound discretion of the court, subject, however, to the well-settled principles which have been established by the courts or fixed by statute; and evidence will usually be received, upon request of the respondent, to show that the writ should not issue. . . . When it is said that granting or refusing the writ rests in the discretion of the court, it is not meant that the court's discretion is absolute, because where a clear legal right to a writ of mandamus is shown, the court has no discretion about granting the writ. And yet the court may refuse it, even though warranted by the rules of law, if hardship or injustice would result to the opposite or to third parties from granting it."

The same learned author last cited, in a further discussion of this question, lays down this additional rule as applicable to it. He says: "If the party have a specific remedy to which he can resort, to compel the performance of the duty, or to obtain redress for its non-performance, the writ should be denied. If he may obtain relief by appeal or writ of error, he will not be entitled to the writ; and since mandamus is the writ of highest dignity known to the courts, it is sufficient ground for refusing it, that the petitioner may have another remedy in the nature of *quo warranto.*" [Sec. 1374.]

It is manifest from the authorities herein indicated that the rule as applicable to the issuance of the writ of mandamus is firmly established, that the granting or denial of an application for a mandamus rests largely within the sound legal discretion of the court, to be exercised in accordance with the established rules of law, and in exercising such discretion the court will consider all of the circumstances, reviewing the whole case, with due regard to the consequences of its action. This court in State ex rel. v. Railroad,

77 Mo. 143, has given expression of its approval of this firmly established rule. We are, therefore, at the very threshold of this controversy confronted with the all-important proposition as to whether or not in the exercise of a sound legal discretion, under all the circumstances and conditions surrounding the conditions of the case at bar, we are required to make the alternative writ of mandamus in this case peremptory.

We have sufficiently indicated in the statement the leading features concerning, not only the history of the construction of this bridge across the Missouri river, but as well the facts applicable and pertaining to the use of it, and the actions and conduct of the public respecting the manner in which such bridge has been used for more than a quarter of a century, and in our opinion, fully considering all the circumstances and reviewing the whole case, with due regard for the consequences of our action, the peremptory writ of mandamus should be denied.

We deem it unnecessary to discuss the numerous legal propositions presented by counsel for relator and respondents. It is sufficient to say that we have carefully read in detail all of the testimony taken by the commissioner at the respective hearings, and in our opinion it fails to show that the failure to open this bridge to the traveling public would be such an injury to the public in general as would require this court, in the exercise of a sound legal discretion, to make this writ peremptory.

We have in this case sharply presented the proposition, even conceding that the charter acquired from the State of Missouri is to regulate and control the construction and operation of this bridge, that it was not obligatory upon the respondents to exercise and put in practical operation all the powers under the franchise secured from the State. It is contended, upon one side, that the charter was only permissive and not

obligatory. On the other side, it is earnestly contended that under the charter it was obligatory upon the respondents to exercise all of their powers under the charter. We repeat, that we deem it unnecessary to determine this controverted question; however, it is not out of place to say that there is some authority supporting the proposition that, where a corporation in securing a charter has received no aid from the State, it may abandon some of the privileges conferred upon it by its charter.

Morawetz on Private Corporations fully discusses this subject, and he very clearly draws the distinction between corporations that have accepted and received the aid of the State for the purpose of constructing railroads or other public utilities and those corporations which merely accept the charter which purports to confer certain privileges and are permissive only. Thus in treating of the obligation to construct a railroad under a charter, in section 1126, the learned author thus concludes that section:. "But in order to hold a railroad company liable to the State to construct the railroad, it would be necessary to place this obligation on the ground of a contract entered into by the acceptance of the charter; and it would be difficult to imply such an agreement where a charter does not, in terms, impose an obligation, but purports to be permissive only." The same learned author, after discussing the English cases upon the subject, says: "Reason as well as the weight of authority indicates that a railroad company does not become liable to the State to construct the railroad contemplated in its incorporation by the mere acceptance of a charter purporting to be permissive only, but if a corporation has accepted and enjoyed the benefit of a grant of state aid for the purpose of constructing a particular railroad, it would undoubtedly incur the obligation to construct the railroad according to the terms of the grant." In section

1129, this same author, who had previously been discussing the rules applicable to the construction of railroads, expressly states that the doctrine he had been discussing in the previous sections were applicable to other corporations than railroad companies, and then says that "the doctrine discussed in the preceding sections applies to other corporations than railroad companies. It may be laid down as a general rule, that, whenever the aid of the government is granted to a private company in the form of a monopoly, or a donation of public property or funds, or a delegation of the power of eminent domain, the grant is subject to an implied condition that the company shall assume an obligation to fulfill the public purpose on account of which the grant was made. Thus a telegraph company may be invested by the Legislature with the right of taking private property by exercise of the power of eminent domain. By exercising this power, the company would incur an obligation to give the public the benefit of telegraphic communication over its lines, at reasonable charges; and any act of the company which would disable it from performing its duties to the public would be prohibited by law."

It is not essential, as before stated, to determine this question, and there is no necessity for further pursuing this discussion. These authorities, together with all the circumstances showing the impracticability and the greatly increased danger of operating this bridge for ordinary road purposes, serve at least to indicate the good faith of the bridge company in the belief that they had the right to at least abandon those parts of the powers and privileges conferred by their charter, and Mr. High's Extraordinary Legal Remedies expressly announces the rule that in order to authorize the issuance of a writ of mandamus, the right it is sought to protect must be clearly established, and the writ is never granted in doubtful cases. Upon some of

the questions involved in this proceeding the testimony taken before the commissioner is in conflict; however, there are some leading features applicable to this controversy that when the testimony is fully analyzed there is practically no conflict.

That it was the original purpose in the construction of this bridge to use it both for railroad and ordinary road travel, there is no dispute. It is equally clear that the testimony conclusively shows that it never was used as a public toll structure for ordinary road travel. In fact, it is perfectly apparent that not a great while after the construction of the bridge the idea of using it for ordinary road travel was completely abandoned, and the public were made fully aware of this abandonment. In 1880 the floor of this bridge was removed and in '94, '95 and '96 the entire bridge was reconstructed and designed exclusively for railroad purposes. While it is true, the testimony discloses that occasionally persons passed over this bridge, but they paid no toll, none was exacted, and there were posters at each end of the bridge excluding the ordinary road traveler. The testimony upon this branch of the case falls far short of establishing that this bridge was ever opened to the public as a toll bridge for general road travel. The reconstruction of this bridge extended over the greater part of the years '94, '95 and '96. The work of reconstruction was evidently in the presence of the entire population of Boonville, and it was but common knowledge, which extended to the State officials as well as the general public, that this bridge was being used exclusively for railroad purposes. They came before the State Board of Equalization and this property was assessed as a strictly railroad bridge, and yet during all these years, from '73 down to 1902, a period of over a quarter of a century, no action was taken by the State asserting the rights that are con-

tended for in this proceeding. In its true sense, the testimony conclusively shows that this bridge was never opened to the public for the use of ordinary travel, and if the general public interests were being ignored by reason of the failure to open this bridge for the ordinary public travel, and there was an earnest general public demand for the opening of it, we confess that the State officials were derelict in the discharge of their duty in not compelling the bridge company to do a quarter of a century ago what it is claimed it should be compelled to do now. A large part of the original indebtedness for the construction of the bridge, at the time of its reconstruction, still remained unpaid. It, therefore, became necessary, in order to reconstruct this bridge and take care of the whole indebtedness, to issue a new set of bonds and make a new mortgage on the bridge to secure the same in the amount of one million dollars. These bonds it seems could not be sold upon the mere strength of the security offered by the mortgage on the bridge, and it seems the bridge company had no other assets; therefore, it became necessary, for the railroad company to guarantee these bonds. They did guarantee them and the bonds were sold and numerous persons are the holders of these bonds to-day.

Now while it is true that the doctrine of estoppel or laches is not applicable to the State and any right it may have is not waived by reason of its inaction or silence, yet we take it that the acquiescence on the part of the State for nearly thirty years in a certain method of operating this bridge should be taken into consideration by the court, in the exercise of that sound legal discretion which it is incumbent upon the court to exercise in the granting or denial of the issuance of the extraordinary writ sought by this proceeding. It also appears in evidence that Captain Porter, who was operating the ferry at Boonville under a charter grant-

ing him the exclusive right to convey persons and
vehicles across the river, threatened litigation with
the bridge company if they undertook to open this
bridge for ordinary public travel. It further appears
that the bridge company could only secure a right of
way at the north end of the bridge for railroad pur-
poses and in view of the claim of the owner of the ferry
and the threat of litigation, the advice of counsel
against the right to open the bridge for general road
purposes, all of which circumstances were known to the
people of Boonville and the officers of the State, and
that the bridge never was opened for public travel and
that it has at all times for the last twenty-five years
been dealt with by the State authorities as purely a
railroad bridge—under this state of facts we see no
escape from the conclusion that the respondents were
acting in good faith and that all of the circumstances
attending the enterprise led them to conclude that
it was not compulsory on the part of the respond-
ents to use the bridge for ordinary road travel, and
it was apparent upon a thorough analysis of all the
testimony in this case taken by the commissioner that
the citizens of Boonville, at the time the conclusion was
reached in respect to the abandonment of the plan of
having this bridge used for ordinary public travel, were
very well satisfied with such conclusion.

The Court of Errors and Appeals of the State of
New Jersey, in the case of Attorney-General v. Rail-
road, 27 N. J. Eq. 1, had in judgment before it, at the
instance of the State, a similar principle involved to
the one in the proceeding at bar. While that case was
not one in which the writ of mandamus was sought, it
was a proceeding for injunction by the Attorney-General
in the interest of the State to prevent the use of certain
property and the franchise connected therewith in a
certain manner. The relief prayed for in that proceed-
ing was denied, and the court in discussing the lapse

of time in asserting rights even by the State, thus gave expression to its views: It was there said: "There is still another consideration constraining me to the conclusion at which I have arrived. The defendants have acted bona-fide, under what they believe to be sufficient legislative authority. They have expended a very large sum of money in their enterprise. It appears by the answer that the estimated cost of their railroad, including viaduct and right of way, is nearly two millions of dollars, of which a million and a quarter have been actually paid on account of the work, and for the balance of the work, to cost nearly six hundred thousand dollars, contracts have been made on which they are liable. At the time of filing the information, the North Pennsylvania Railroad Company had expended on their part of the enterprise nearly a million and a quarter of dollars, making an aggregate of expenditures, by them and the defendants, of about two millions and a half, of which about three hundred and thirty-seven thousand dollars were expended on the viaduct alone. The information was not filed until nearly a year after the construction of the viaduct was commenced, and not until it and the road were almost completed, and no excuse is given for the delay. The State authorities must have been aware of the circumstances, of the great cost of the work, of its vital importance to the enterprises of which it was part, and of the great expenditures made upon them. The locality of the viaduct is near the capital of the State. The Legislature had had its usual annual session of many weeks, since the work on the viaduct was begun. The work had been from its commencement a matter of public notoriety, and yet no action has been taken on the part of the State authorities, nor even any warning uttered by them against the work. The defendants have been permitted to make their immense expenditure upon their enterprise, in the confidence of their convictions that

they possessed all requisite legislative authority, without even a word of protest or remonstrance.''

A similar rule was announced in People v. Chapin, 104 N. Y. 96; however, in that case it is but fair to state that the writ of mandamus was sought for the benefit and protection of a private individual.

We have read in detail the testimony taken by the commissioner upon the question as to the feasibility of using this bridge jointly for railroad and ordinary road travel, and concerning the inconvenience and disadvantage that such use would be to the railroad company. The testimony as disclosed by the record tends at least to show that this bridge was about eighteen hundred feet long and that there were about twenty-four schedule trains crossing the bridge every day. It was also shown that while there were certain trains scheduled for each day, there were many special and extra trains over the road that could not have schedule time, and that freight trains would be run in several sections, that is, while the train was scheduled under a certain number and to arrive at a certain time, yet, because there would be too many cars to go in one train, a number of trains would be made up and designated sections; that sometimes there would be two or three sections and frequently as many as six or seven sections of the same train, which would all carry the same train number with the additional number of the section.

We have also carefully analyzed the testimony respecting the approaches to this bridge, and in our opinion no one can read the testimony and carefully consider it respecting the operation of this immense structure across the Missouri river without being convinced that such bridge could not be used jointly for railroad and ordinary wagon travel without being attended with extreme danger and hazard to the traveling public. This court, if for no other reason, would hes-

itate a long time before undertaking to compel unwilling agents to equip a structure which would induce the public to use it, fraught with so much danger and hazard to those who might see proper to avail themselves of the use of it, and which may in the end result in many serious and probably fatal accidents.

The long delay in the institution by the State of this proceeding to compel the equipment of this well-known structure for ordinary road travel is a very strong circumstance pointing to the impracticability, as well as the absence of an earnest general public demand, in view of its peculiar location and the conditions surrounding it, of its joint use for railroad purposes and ordinary road travel.

After a most careful consideration of all the testimony taken by the commissioner and returned to this court we are not convinced that the failure to equip this bridge for the joint use of ordinary public travel and railroad purposes, is such an injury to the public in general as would justify this court, in the exercise of a sound legal discretion, in granting the extraordinary writ of mandamus which is sought by this proceeding. This is unlike the case of a bridge company or a railroad corporation which had opened a bridge or operated a railroad for the convenience of the public, and after having operated the structure for toll or the use of the ordinary traveling public and the railroad corporation had operated its railroad in the transportation of passengers and freight, then under those circumstances should systematically refuse to permit ordinary road travel over the bridge for reasonable toll rates, or the railroad should refuse to transport passengers or freight on reasonable terms. This sort of action and conduct on the part of such corporation could be truly and properly termed an injury to the public in general, and under such circumstances a writ of mandamus should be granted at the instance of the State to

compel the corporation to perform its public duty; but it is manifest that is not this case. Nor does the testimony satisfy us that there is such an earnest public demand for the equipment of such structure for ordinary road travel in connection with the use of it for railroad purposes as would justify us, under all the circumstances and conditions surrounding the operation of this bridge, in granting the writ sought by this proceeding. Confronted by the testimony detailed before the commissioner in which all the circumstances and conditions surrounding the operation of this bridge are described, we are unwilling to say that this presents such a clear case that no substantial doubt can be entertained by the court, in the exercise of its discretion, in granting the writ sought by this proceeding. We again repeat the rule as announced by Mr. High, in which it is said that "this writ is never granted in doubtful cases." It is well that we heed the warning so clearly indicated by the authorities applicable to the issuance of this writ. If it is granted we can readily surmise the many difficulties which would confront us of supervising unwilling agents in the performance of a continuing duty of so complicated a nature as that of properly managing this structure in its joint use of both ordinary and railroad travel, which involves the exercise of a large amount of discretion and technical skill. It was from a most careful consideration of the difficulties above suggested that the wise rule "whether a writ of mandamus shall be issued is in every case a matter resting largely in the discretion of the courts, and depends upon all the surrounding facts and circumstances," sprung into existence, and has met with such universal favor by all the courts of the country.

We have indicated our views upon the question as to the exercise of a sound legal discretion in granting or denying the writ sought by this proceeding. The conclusions reached render it unnecessary to discuss

the other propositions disclosed by the record. The peremptory writ of mandamus should be denied, and it is so ordered. *Gantt, C. J., Valliant* and *Burgess, JJ.,* concur; *Lamm, Graves* and *Woodson, JJ.,* not sitting.